## MENNA v. MENNA.
### No. 7173.

United States Court of Appeals for the

District of Columbia.

Argued Dec. 6, 1938.

Decided Jan. 9, 1939.

Rehearing Denied Feb. 6, 1939.

Ward B. McCarthy, of Washington, D. C., for appellant.

No appearance for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

GRONER, C. J.

In the District of Columbia a divorce a vinculo may be granted for conviction of a felony "involving moral turpitude" where the sentence is for as much as two years and is served in whole or in part.[1]

In this case Margaret Louise Menna sued her husband, Victor A. Menna, for absolute divorce. She alleged that he had been twice convicted under the Harrison Narcotic Act;[2] that he had been sentenced to the penitentiary for terms of from one to three years and one to five years respectively; and that at the time of bringing the suit he had been serving the sentence for more than two years.

There was a motion to dismiss the bill on the ground that a conviction under the Narcotic Act did not involve moral turpitude. The trial court overruled the motion, and we granted a special appeal limited to that question.

Counsel for appellant says that the Harrison Act is a revenue statute and that a careful investigation will disclose no Federal case holding that the violation of that Act or of any other revenue Act involves moral turpitude. United States ex rel. Andreacchi v. Curran, Commissioner, D.C., 38 F.2d 498, and Martinez v. Nagel, Commissioner, 9 Cir., 53 F.2d 195, are relied on to sustain this view. In the former case Judge Goddard, on a warrant of deportation, held that violation of the Harrison Act did not involve moral turpitude. He based his conclusion on the ground that the Act had been sustained by the Supreme Court solely because it was a revenue Act, and he thought that fact foreclosed any inquiry into the nature of the activities which the statute was designed to suppress. In the latter case the Court of Appeals in the Ninth Circuit, likewise in a deportation proceeding, stated that [page 196]—"The government does not contend that the alien's conviction under the terms of the Harrison Narcotic Act renders him liable to deportation". We do not consider the argument in the one case or the concession in the other as controlling in the case at hand.

It is quite true the Supreme Court in the Doremus Case[3] upheld the constitutionality of the Act under the taxing power of the United States. But it is also true the Court rejected the argument that the Act should be declared unconstitutional because its effect was to accomplish another purpose. And in the Jin Fuey Moy Case[4] the other purpose was assumed to be the moral end to be accomplished in carrying out the objects of the International Opium Convention —the abatement of the drug habit.

When the necessity of legislation to control the narcotic evil was recognized some thirty years ago, the United States joined

---

[1] D.C.Code, Tit. 14, Sec. 63 (Supp. III), as amended by Act of Aug. 7, 1935, 49 Stat. 539.

[2] 26 U.S.C. 1040–1054, 1383–1391, 26 U.S.C.A. §§ 1040–1054, 1383–1391.

[3] United States v. Doremus, 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493.

[4] United States v. Jin Fuey Moy, 241 U.S. 394, 36 S.Ct. 658, 60 L.Ed. 1061, Ann.Cas.1917D, 854.

six other nations in consultation with a view to its suppression. The movement has grown until today it embraces the sixty-four nations of the world, as the result of which there is now said to be—though perhaps too optimistically—world-wide control of the manufacture and shipment of narcotics. State consciousness of the extent of the evil has developed in line with this world movement, and forty of the forty-eight States now have adopted laws paralleling the Federal statute. In consequence of all of this, it has become a matter of general knowledge that the habitual use of opium produces crime, violence, brutality, and insanity. The Narcotic Bureau's Report for 1937 discloses that 63% of the narcotic violators arrested in that year had previous criminal records.[5] There can be, therefore, no question of doubt in anyone's mind that the peddler of these dangerous drugs is a menace to society. Nor can there be the slightest doubt that the crime which it is the purpose of the statute to punish is one involving moral turpitude. An act which creates human misery, corruption, and moral ruin in the lives of individuals is necessarily so base and shameful as to leave the offender not wanting in the depravity which the words "moral turpitude" imply. The idea that because under the limitations of the Constitution it was necessary to exercise the taxing power to stamp out this nation-wide evil, the wrong denounced in the Act is stripped of its innate wickedness and the wrongdoer of his turpitude, is a view we are unwilling to accept. It is not the source of Congressional power but the end Congress had in mind to accomplish that determines the question we have to decide; and there can be no doubt that the end was to stamp out by punishment wicked and shameful acts like those of which appellant was convicted. Just as it may not be contended that the unlawful traffic in women for purposes of commercial prostitution denounced in the Mann Act[6] does not involve moral turpitude because the source was the power to regulate commerce between the States—so, we think, it cannot be held here that appellant's offense to society in general is not moral turpitude within the provisions of the divorce statutes of the District of Columbia.

Appeal dismissed.

---

5 Traffic in Opium and Other Dangerous Drugs, U. S. Treasury Department, Bureau of Narcotics, published by Govt. Printing Office, 1938, pp. 58–59, 83.
6 18 U.S.C.A. §§ 397–404.