**Cecil William MYERS and Joseph Howard Sims, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 23847.**

United States Court of Appeals Fifth Circuit.

May 15, 1967.

Rehearing Denied June 19, 1967.

---

Jim Hudson, Athens, Ga., for appellants.

Floyd M. Buford, U. S. Atty., Macon, Ga., St. John Barrett, Atty., Dept. of Justice, John Doar, Asst. Atty. Gen., David L. Norman, Alan G. Marer, Joel M. Finkelstein, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before TUTTLE, Chief Judge, AINSWORTH, Circuit Judge, and FULTON, District Judge.

TUTTLE, Chief Judge:

This is an appeal from conviction and sentence of the appellants, Myers and Sims, to serve ten years imprisonment for violation of Title 18, U.S.C.A. Sec.

241,[1] one of the basic civil rights criminal statutes.

These appellants, together with one Hampton Turner, were tried jointly for engaging in a conspiracy "to injure, oppress, threaten, and intimidate Negro citizens of the United States in the vicinity of Athens, Georgia, in the free exercise and enjoyment by said Negro citizens of the following rights and privileges secured to them by the Constitution and laws of the United States:

"The right to travel freely to and from the State of Georgia and to use highway facilities and other instrumentalities of interstate commerce within the state of Georgia;"

The indictment charged that these three conspired with three other named defendants, Herbert Guest, James Lackey, and Denver Phillips, and "with other persons to the Grand Jury unknown." Upon motion, the last three named defendants obtained a severance for the purposes of trial and were not tried jointly with Myers and Sims, the appellants here, and Turner, who was acquitted by the jury.

The indictment against the six men alleged:

"It was a part of the plan and purpose of the conspiracy that its objects be achieved by various means, including the following:

1. By shooting Negroes;

2. By beating Negroes;

3. By killing Negroes;

4. By damaging and destroying property of Negroes;

5. By pursuing Negroes in automobiles and threatening them with guns;

6. By making telephone calls to Negroes to threaten their lives, property, and persons, and by making such threats in person;

7. By going in disguise on the highway and on the premises of other persons;

8. By causing the arrest of Negroes by means of false reports that such Negroes had committed criminal acts; and

9. By burning crosses at night in public view."

■ Both from a careful reading of the transcript of the evidence and by the admission by the appellants in their brief filed in this court, it is clear that the jury had ample evidence on which to find that the existence of the conspiracy and participation in it by these two appellants was adequately proved. Specifically, there was before the jury evidence that warranted a finding that of the listed means alleged in the indictment to be used by the conspirators there was adequate proof that they committed all of the acts with the possible exception of those listed in item number 4. The record, in fact, disclosed that these appellants and their fellow conspirators created what might, without exaggeration, be called a reign of terror from January 1, 1964, until the filing of the indictment in October, 1964, so far as Negro citizens in and about Athens, Georgia, were concerned.

Specifically, the evidence disclosed, without objection, so far as this appeal is concerned, that appellants, together with some of their fellow members of the Athens chapter of the Ku Klux Klan, participated in the following acts of violence towards Negro citizens in Athens or vicinity.

In March, 1964, a group of young Negroes in Athens picketed The Varsity

---

1. Sec. 241. Conspiracy against rights of citizens.

 If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

 If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

 They shall be fined not more than $5,000 or imprisoned not more than ten years, or both.
 18 U.S.C.A. Sec. 241.

drive-in, a restaurant in Athens, because of its failure to serve Negro persons. Soon after the Negro pickets started to march each night, a group of white robed klansmen, including Sims and Myers, would arrive and counter-picket the Negroes. On one occasion, the chief of police of Athens observed sawed off shotguns in one of the klansmen's car. These shotguns were in plain view on the seats along with shotgun shells and an ammunition box. Two of these guns belonged to Guest and one to appellant Sims. On this occasion a Negro named Weaver, while demonstrating, was struck on the head with a revolver by Sims, who claimed that he intervened to prevent Weaver from hitting an officer with a broomstick. Sims then cocked and pointed his gun towards the Negro pickets and threatened them until he was disarmed by a police officer. On another occasion, during the counterpicketing, Sims was seen down the street from The Varsity with a pistol strapped to his side.

On another night in March, a Negro named Potts, who worked for Herbert Guest at his garage,[2] was sent by Guest to the back of an auditorium building to help start a car which was reported to have had trouble. At about midnight Potts arrived and found the car with its hood up parked nearby, and a man standing near it. As Potts approached to assist in starting the car, he saw eighteen hooded klansmen come from the basement of the auditorium. One of these men, whom Potts identified as appellant Sims, ordered Potts to bend over the hood of the car, and another member of the gang produced a leather strap and severely lashed Potts. Later the same night after Potts reported back to work, Sims telephoned Potts again and asked him to help with another car. Potts, having been laughed at by Guest when he returned from the first trumped-up accident, declined to go.

On the evening of June 21, 1964, two automobiles were driven slowly through the Broad Acres apartment development in Athens (a Negro residential area). One car was driven by Myers and the other contained co-conspirator Guest. Shots were fired over the top of the building from one of the cars. On the second occasion, later in the evening, a car containing a person identified as Guest, stopped in the vicinity of the apartments, and on this occasion two shotgun blasts were fired into the apartments. A Negro man was struck and permanently blinded in one eye, and a thirteen year old girl was shot in the lip. A Negro witness, who identified the occupants of the car to police officers, was thereafter followed around the city of Athens in a car occupied by appellants, Sims and Myers.

Bearing more specifically on the alleged conspiracy to deprive Negro citizens of their rights to use federal highways, is the incident that occurred on July 4, 1964. On this occasion an elderly Negro couple driving a car with a New Jersey license plate stopped in Athens, where the driver asked a police officer for directions to Atlanta. The police officer testifed that while he was giving directions, Sims and Myers, the appellants, both wearing pistols in holsters strapped to their sides, came up, and, according to the testimony of one police officer, Sims told the Negro couple to "get their black asses back up north where they come from." According to the recollection of the other officer, Sims said, "Hit [highway] 29 you black son of a bitch and go back to New Jersey where you came from." The police officer testified that this elderly Negro couple from New Jersey made haste to drive off without ever getting directions at Atlanta.

On the same day a young Negro man named Rittenberry, from an adjacent county in Georgia, passed by Guest's garage, where he saw seven or eight men armed with pistols and shotguns standing in front. Three of them got in a car and began following Rittenberry about the city. He could see the man in the

2. Much of the gathering of the defendants and the other members of the group frequently seen acting with them, took place at Guest's garage at night.

back seat holding a long barreled gun resting it on the seat and "pointing toward the rear of his car." Two female passengers in Rittenberry's car were lying down in the back seat "because they were scared." Rittenberry drove to a Negro drive-in cafe where he had someone call the police. Two police officers arrived and found Sims and Myers and co-conspirator Phillips sitting in a car near the cafe. Thereupon Sims asked the officers to check the tag on Rittenberry's car. Sims was wearing a holster with a pistol in it. The officer checked the license tag, which had been issued for a previous year, but Rittenberry had a bill of sale showing that he had just bought the car and the officers found there was no law violation.

On July 7th at about midnight, appellant Sims, who was then in company with appellant Myers and co-conspirators Lackey and Guest, reported to the police that they had noticed prowlers around Lackey's house and they gave the police the license number of a car which had just been driven past that house by one, Negro Frank Gilmore. Police arrested Gilmore "for investigation" at 1:00 A.M., but following an investigation they found no indications of prowlers around Lackey's house and after having apparently corroborated Gilmore's story that he was not in the vicinity at the time, they released him the next day.

As to the incidents which have thus far been described, appellants neither contend that there was not sufficient evidence to warrant the jury's finding the existence of the conspiracy, nor do they attack any of the evidence as being improperly submitted to the jury.

With respect to the incidents next to be related, the appellants make the admission of the evidence relating to them the basis of their principal contentions of error on this appeal.

On July 11, 1964, at approximately five o'clock in the morning, Lt. Col. Lemuel Penn, a Negro officer in the United States Army Reserve, who was driving from Fort Benning, Georgia, to Washington, D. C., was killed in the vicinity of Athens, Georgia, by a shotgun blast to the head fired point blank from a car which the jury could determine was occupied by Sims and Myers and a third conspirator. This event and the manner in which the evidence was introduced in connection with it will be discussed more fully in the discussion of the legal issues involved.

In October, 1965, nearly a year after the other incidents, these appellants, together with five other armed men, assaulted George Turner, a one-legged Negro farmer on a road near Crawfordville, Georgia, and a shot was fired at Turner's brother who came to his help by one of the group of armed men. There is no question raised as to the facts surrounding this occurrence, or the fact that both Sims and Myers participated in this outrage. The question, discussed below, is whether it was admissible as proof of a conspiracy which had ended approximately one year earlier.

We first discuss the Penn incident. Colonel Penn, accompanied by two other Negro Army officers from Washington, left Fort Benning, Georgia, after having performed summer training duties there, by automobile, planning to drive to their homes in Washington, D. C. They stopped in Athens, Georgia, where Colonel Penn took the wheel. At about 5:00 A.M., some twenty miles outside of Athens, just before reaching a bridge spanning the Broad River, a light colored car moving in the same direction pulled alongside the Penn car. Two shotgun blasts were fired, one of these going through a rear window and missing the occupants. The other blast smashed a hole in the window near Colonel Penn, struck his head and killed him instantly. When Colonel Penn slumped from the steering wheel, Major Brown, who was sitting next to him, attempted to stop the car. Assisted by Colonel Howard, the third officer, the car stopped shortly after crossing the bridge.

Neither of the other officers was able to identify the persons who were in the passing car from which the shots came. However, Tom Stevens, a witness called

by the government, testified that shortly before daybreak on the morning Colonel Penn was shot, he went to Guest's garage, and was told by co-conspirator Guest (not on trial) of appellants' involvement. Stevens testified as follows:

"Q. Well, let me ask you this question. Did Mr. Guest mention to you the name James Lackey or Howard Sims or Cecil Myers? Were their names mentioned this morning of July 11 when you were down there in connection with the boat?

A. Yes sir.

Q. What did he say about these three men?

A. He said they had left there—er—they was chasing a Negro car with a D. C. tag on it.

Q. Said they left there?

A. Yes sir.

Q. Doing what?

A. Chasing a car with a D. C. tag on it.

Q. Was anything said about a gun?

A. No sir, they (sic) wasn't any thing said about the gun then.

Q. Well, was something said about the gun later?

A. He said they had his gun.

Q. Said who had his gun?

A. Them boys.

Q. Name the boys you are talking about.

A. Howard and—

Q. Howard Sims?

A. Yes sir.

Q. And who else?

A. And Lackey.

Q. James Lackey?

A. Yes sir. And Myers.

Q. Cecil Myers?

A. Yes sir.

Q. Said they had his gun?

A. Yes.

\* \* \* \* \* \*

Q. What was said about chasing a Negro?

A. Said they left there chasing some, were going to follow some, and that he would have went with them but wasn't nobody there but him.

Q. Was anything said about where the Negroes were from?

A. Said it was a D. C. tag, Washington, D. C. tag.

Q. What was it he said was the reason he didn't go?

A. That he was by himself at the time."

The appellants objected to the admission of this evidence on the ground that, although there was sufficient evidence from which the jury might find that Guest was a co-conspirator with Sims and Myers and Lackey, as charged in the indictment, the statement Guest made to the effect that Sims and Myers and Lackey had gone off "chasing a Negro car with a D. C. tag on it," and that they had his (Guest's) gun was not admissible against anyone other than Guest because the jury could not find that the statement made about the three persons was made "in furtherance of the conspiracy."

The trial court overruled the objection and then and there instructed the jury as follows:

"Whenever the jury believes from evidence, independently of any such statement itself, that a conspiracy exists and that the person making the statement is a member of that conspiracy, and that other people about whom he makes the statement are also members of that conspiracy, then such a statement, made during the pendency of the conspiracy, if made in furtherance of the objects of the conspiracy, are admissible against all who are then members of the conspiracy, just the same as if they made the statements themselves, or if the statement was not made out of court but made in court." [3]

---

3. It is to be noted that the trial court repeated this same instruction when the case was submitted to the jury, dealing with Stevens' testimony as to the statement made to him by Guest.

The United States contends that Guest's statement to Stevens was admissible on each of three independent grounds. First, it contends that the jury could find that the statements were in furtherance of the conspiracy. Second, it argues that it was admissible as a part of the *res gestae* of an act done in furtherance of a conspiracy (the chasing of the Penn car). In the third place it contends that it was admissible to show Guest's own purpose or intent to harass Negroes traveling interstate since he said that he would have gone with the other three if he had been able to leave his place of business, thus proving the overall purpose of the conspiracy as stated by one of its alleged members.

In support of its theory that the trial court correctly admitted the testimony of Stevens as being a declaration by a conspirator in furtherance of the conspiracy, the government points to other evidence which would warrant a jury's determining that the members of the conspiracy, which the jury could find from other evidence had been proved to exist, had invited Stevens to join in the conspiracy, and that this recitation of the acts of Sims and Myers, as revolting as they were, could be found by the jury to be a persuasive fact in interesting Stevens to participate in harassing Negroes and interfering with their civil rights. The evidence includes testimony by Stevens that in the same conversation Guest insisted that he go with him to breakfast. This testimony is as follows:

"[Mr. Buford] Q. * * * Now tell me just what Mr. Guest said to you.

[Stevens] A. * * * Well, he— when we got the lights on the trailer, I pulled up there at the service station and filled the car up with gas and was standing there talking to him, and he wanted me to go to breakfast with him, and I told him I needed to go on, I had to go, and he said 'Oh, come on and eat breakfast with me. I'll buy your breakfast.' I said, 'I don't want any breakfast.' He said, 'Well, come on and go with me and we'll ride out here—I want to go out here and see about a couple of fellows, see where they are at.' I said, 'No, I got to go.' And I went on to Charlotte."

Further, the government points to testimony by Stevens that he had been invited on other occasions by the appellants themselves, Sims and Myers, "to go out and ride around with them." This testimony was in the following language:

"Q. You have already told us which one of these defendants was in the security patrol of the Ku Klux Klan. Have any of these defendants—Mr. Howard Sims, Mr. Myers, Mr. Herbert Guest, Mr. Denver Phillips—have any of these defendants invited you to ride with them?

A. Yes, they invited me to go out and ride around with them, they didn't specify anything, any particular thing they were going to do, or anything, said 'go ride around.'

Q. They didn't tell you what the ride was for?

A. No, sir.

Q. But you declined the invitation?

A. Yes, sir."

The government contends that in light of the earlier testimony already submitted to the jury concerning the activities of some of the conspirators, including these appellants, in "riding around" the city of Athens and its environs, the jury could infer that they were attempting to solicit Stevens' participation in the same kind of "rides" which had been testified to, or, in other words, to solicit Stevens' participation in the conspiracy itself.

There is no dispute between the United States and appellants as to the standard which the courts have said is to be followed where an exception is recognized to the hearsay rule where the declaration of one conspirator is admitted in evidence against his fellow conspirators. In fact, we quote from the brief of the appellants:

"There is no question at all that a statement made by a co-conspirator in the furtherance of a conspiracy is admissible against other co-conspirators.

However, defendants hasten to call the court's attention to the fact that such a statement must be made in *'furtherance'* of the conspiracy."

Appellants cite Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed. 2d 278, and Krulewitch v. United States, 336 U.S. 440, at page 443, 69 S.Ct. 716, 93 L.Ed. 790. In *Krulewitch* the Supreme Court said:

"There are many logical and practical reasons that could be advanced against a special evidentiary rule that permits out-of-court statements of one conspirator to be used against another. But, however, cogent these reasons, it is firmly established that where made in furtherance of the objectives of a going conspiracy, such statements are admissible as exceptions to the hearsay rule. This prerequisite to admissibility, that hearsay statements made by some conspirators to be admissible against others, must be made in furtherance of the conspiracy charged, has been scrupulously observed by the federal courts." 336 U.S. 440, 443, 69 S.Ct. 716, 718.

■ We think it perfectly clear here that the trial court did not err in submitting to the jury the question whether, in light of the other evidence admitted without valid objection, these declarations made by Guest to Stevens were made to induce Stevens to be a participant in the illegal conduct which the jury could find appellants and Guest, as well as others, were engaged in.

For the purpose of this discussion, we can accept the definitions put forward by the appellants as to the meaning of the word "furtherance." Appellants quote Powers v. Commonwealth, 114 Ky. 237, 70 S.W. 644, as saying:

"The word 'furtherance' as applied to the act of one accomplice in the furtherance of a criminal project has a well defined and generally accepted meaning. It is the act of furthering, or helping forward or promotion, or advancement."

People v. Smith, 151 Cal. 619, 91 P. 511, says:

"The word 'furtherance' within the rule that no declarations except those made during the pendency of a conspiracy and in furtherance of its objects can be used against a co-conspirator, means an act, statement, or declaration which in some measure, aids or assists towards the consummation of the object of the conspiracy."

The fact that this particular conspiracy was of the sordid, mean and ugly nature which it was, makes it somewhat difficult to apply the normal rules of evidence. Normally a conspiracy to violate a federal statute is thought of in terms of an agreement to do something, albeit illegal, that has the chance of being of material or financial benefit to the conspirators. Here the conspiracy charged is one merely to wreak havoc on persons of a minority group. If those already committed to that kind of conduct seek to obtain converts, then this missionary work must be done by explaining the very nature of the ugly acts that are being perpetrated. Surely, under these circumstances, we cannot say that the jury would not be warranted in finding that Guest's very purpose in telling about his friends chasing the Penn car was to persuade Stevens to join the vigilante activities. This is strengthened by the subsequent testimony by Stevens that Guest thereafter urged him to go with him to a place for breakfast where he hoped to "see about a couple of fellows, see where they are at," and by Stevens' testimony that Sims and Myers had themselves invited him to "ride around" with them.

We conclude that the trial court correctly admitted this evidence to the jury for its consideration with the carefully worded limiting instructions as to the manner in which they could view it.

■ Moreover, since Guest himself had furnished the gun for the chasing of the Penn car, we agree with the United States that this statement by him as to the use that his co-conspirators were put--

ting the gun to was admissible as part of the *res gestae,* that is of Guest's act in permitting his alleged co-conspirators to take his weapon with him. Rogers v. United States, 5 Cir., 334 F.2d 83, 84, 86.

It is to be remembered, further, that there was other evidence of admissions directly from Sims and Myers as to their participation in the Penn murder. Stevens testified that after the day of the Penn murder Sims and Myers together laughed about the killing and one or the other of them said that "the timing was off on the shooting of the car." He testified: "They said they miscalculated on the shot on the car, that they went on the bridge instead of in the river." Then following the question by the prosecuting attorney, "Did what?" he answered again saying, "Went on the bridge instead of in the river."

The testimony of those in the Penn car was to the effect that the assailants shot into the automobile shortly before it got to the Broad River and that by the hardest maneuvering they kept it on the road onto the bridge instead of going out of control and into the river. The jury could have concluded that these admissions by Sims and Myers were intended to explain to a fellow klansman that they had intended to shoot the driver in such a way that would cause the car to miss the bridge and disappear into the river instead. To this extent, therefore, the testimony given by Stevens as to Guest's declaration of the activities of Sims and Myers was merely cumulative of other even more damaging evidence that was before the jury.

The other occurrence, the evidence concerning which is made the basis of attack here, is the beating of George Turner, a Negro farmer of Crawfordville, Georgia, some time after the indictment was returned against these defendants. What happened on the Sunday while Turner was on his way to church can best be stated in his own words:

"A. Well, after I got about a mile and a quarter from the house I met a car. I seen a car coming so I pulled over on my side of the road and they was over on their side until they got about as close to me as them doors there and they switched right over on my side. So I just hit my brakes. When I did—see, I didn't know it was two cars. When I hit my brakes this one run around me and another one come up in front of me. I said, 'Man, what in the world's the matter with you!' Just like that. At that time they stopped the other car and come to jumping out of the cars with guns, shotguns and pistols and one thing and another, and one said, 'What did you say nigger?' And I didn't say nothing. And he said, 'You black son-of-a-bitch, I'll find out what you said.' So he come up and started poking at me.

Q. You still in the car?

A. Yes sir. I didn't have time to move. I wasn't even expecting nothing. So he started hitting at me. I just throwed up my arms like that and tried to dodge. He was trying to hit me in the face but my car is low, low top, and I kept my head back out of the way, and he reached over there and tried to pull me out and commenced to hitting on me like that. Then about that time I heard my brother scream, and he said 'That's my baby brother—

Q. Wait a minute, George, I thought you were by yourself?

A. He was in his car.

Q. Oh, he was behind you?

A. Yes sir. He had done come up behind.

Q. Now let me ask you, how many cars was it out there all together when they were—when this man was trying to hit you?

A. Well, it wasn't nobody but them two and my car to start off with.

Q. There was two cars?

A. Of them.

Q. Of them. Now let's find out who 'them' are. Were they white men or Negro men?

A. They was white men. They had on black. All of them was dressed in black.

Q. What do you mean, black suits of clothes?

A. They had black shirts and one thing and another, black britches.

Q. Black shirts?

A. And black britches.

Q. And there was two car loads of them?

A. Yes sir.

Q. Did more than one of them get out of the car?

A. Yes sir, all of them got out, got out with their shotguns and pistols.

Q. And one of them was trying to hit you there while you were under the wheel?

A. Yes sir.

Q. And then your brother approached?

A. Yes sir.

Q. What happened when your brother got there?

A. I heard him screaming, saying 'Don't you all—that's my baby brother, don't you all hurt him, please.' See, he was behind back there and this other one was standing up there side of the car and I couldn't hear too much what was said, cause he was trying to hit me, was hitting me on the arm, but I was trying to dodge my head out of the way. Wasn't nothing else I could do there among all them guns and one thing and another.

Q. Did you stay in the car?

A. I didn't get out. I couldn't get out among all them guns, no sir."

Turner identified both Myers and Sims as having been in the group of black-shirted men that stopped him, and he identified Myers as the person who hit him.

Before this evidence was tendered, the trial court charged the jury with respect to it in the following language:

"An objection was made to some offered evidence just before we adjourned and counsel have been heard and the ruling of the Court is as follows: Some evidence is being tendered by the Government with reference to some transactions which the Government contends that some of the defendants participated in subsequently to the date of the returning of this indictment.

"I charge you that evidence as to these subsequent transactions is going to be admitted for a limited purpose only. It will not be admitted for the purpose of convicting any defendant on those transactions. You could not convict a defendant on those transactions for the obvious reason that if they occurred they occurred after the grand jury returned the indictment, and therefore they are not indicted for those transactions.

"Evidence of those transactions is going to be properly admitted for a limited purpose only and you may consider such evidence for a limited purpose only, namely: in determining the motive and the intent of the defendant or defendants who participated in those subsequent transactions with respect to their intent and motive as to the matters charged in the indictment."

After the testimony quoted above, there was evidence that the seven men involved were arrested by the Sheriff of Taliaffero County, and, upon a search warrant being obtained, there was taken out of the two automobiles a quantity of firearms, including pistols and sawed-off shotguns.

 Appellants concede, "There is ample authority for the proposition that evidence as to transactions subsequent to the return of the indictment can be admitted for a limited purpose, that is to determine the motive and intent of the defendant as to matters charged in the indictment, if the circumstances show a

sufficient connection from which inferences may reasonably be drawn." This is certainly the law. See Roe v. United States, 5 Cir., 316 F.2d 617, where at page 321 this court said:

"[W]hen intent, as distinguished from knowledge, is being established, it matters not whether the acts are prior or subsequent to the time of the crime charged. 'Intent is a state of mind difficult of precise proof and, therefore, evidence of other and surrounding circumstances may be received for the purpose of proving such intent. Acts done and declarations made after the act of which the defendant is accused are admissible as bearing on intent.' "

The appellants seem to make the novel contention that since in the conspiracy here outlawed, guilt can be found without the proof of any overt act, Smith v. United States, 8 Cir., 157 F. 721, the rule does not apply.

■ Here, the indictment charged that these six persons and others unknown to the grand jury, "conspired together * * * to injure, oppress, threaten and intimidate Negro citizens * * * in the free exercise and enjoyment" by them of certain constitutional rights. There being nothing illegal in the association of these persons to ride around together, talk together or accomplish legal objectives together, it was, of course, an ingredient of this crime that the government prove that they had the unlawful intent in their association "to injure, oppress, threaten and intimidate Negro citizens" as the indictment alleged. Moreover, the indictment specifically charged that the plan and purpose of the conspiracy was to achieve its objectives by various stated means. It thus became incumbent upon the government to prove an intent by the members to use these particular means. It is difficult to understand, therefore, how it can be claimed that the general rule of permitting the introduction of post-indictment evidence from which the jury could ascertain the intent of the persons charged during the period alleged

to be covered by the conspiracy does not apply in such a case as this. The introduction of such evidence is not restricted to conspiracy prosecutions. Schultz v. United States, 8 Cir., 200 F. 234, nor is it made unavailable in conspiracy prosecutions. Roe v. United States, supra. Burt v. United States, 5 Cir., 139 F.2d 73. We perceive no basis for excluding the evidence here merely because, as contended by the appellants, the crime of conspiracy under Title 18 U.S.C.A. Sec. 241, does not require the proof of an overt act. The commission of the crime itself does involve a specific intent to deprive Negro citizens of their constitutional rights. If this intent is demonstrated by conduct of the appellants subsequent to the date of the conspiracy, then the proof of this conduct falls within the rule. We conclude that this evidence was admissible under the limiting instruction given by the trial court.

The final ground of appeal upon which the appellants rely is the refusal by the trial court to permit appellants' counsel to cross examine the witness Stevens as to a plea of nolo contendere, which he had entered for the violation of a federal misdemeanor statute. This issue was raised on the trial of the case by request made by appellants' attorney that the court permit him to inquire of Mr. Stevens as follows:

"Mr. Stevens have you ever been convicted of a federal offense for which you received a probated sentence."

Upon the government's objection, the trial court permitted counsel to discuss the issue in the following manner:

"Mr. Buford: (Government's Counsel) [Addressing appellants' attorney and referring to the question appellants' attorney wished to ask Stevens.] And you are referring specifically to the instance where Stevens pleaded guilty to dispensing amphetamine sulphate tables without a prescription in violation of the Pure Food and Drug and Cosmetic Act, which is a misdemeanor under the federal law. That's what the question is directed to?"

"Mr. Hudson: That's right and I further wanted to ask him if he is now serving the probationary sentence."

The Court: "From that offense?"

Mr. Hudson: "Yes, sir."

Mr. Buford: "And the government agrees that he will ask that question and we stipulate that the Court denied him the right to do that, the privilege."

It is undisputed that it is permissible to attack the credibility of a witness by showing that he has been convicted of a felony or of a misdemeanor involving moral turpitude. Roberson v. United States, 5 Cir., 249 F.2d 737, 72 A.L.R.2d 434, cert. denied 356 U.S. 919, 78 S.Ct. 704, 2 L.Ed.2d 715. It is plain that the violation as to which counsel wished to question Stevens does not satisfy this requirement. The alleged violation is of 21 U.S.C.A. Sections 353 (b) (1) (B), 331(k) and 333. Section 333 provides in pertinent part:

"Any person who violates any of the provisions of section 331 of this title shall be guilty of a misdemeanor and shall on conviction thereof be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both such imprisonment and fine; but if the violation is committed after a conviction of such person under this section has become final such person shall be subject to imprisonment for not more than three years, or a fine of not more than $10,000, or both such imprisonment and fine."

Appellants contend that a decision by the Court of Appeals for the Ninth Circuit in Cardiff v. United States, 194 F.2d 686, aff'd 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200, has in effect held that this statute makes a first offense a felony. A reading of the *Cardiff* case demonstrates that this is not a proper construction of that decision.

Appellants made no offer of evidence in an effort to prove that even though a misdemeanor, this offense involved moral turpitude in the sense in which that term has been used to permit introduction of the fact of a conviction for impeachment purposes. Moreover, as pointed out by the trial court, the provisions of Section 333 create a misdemeanor without reference to criminal intent. See United States v. Dotterweich, 320 U.S. 277, 284, 64 S.Ct. 134, 88 L.Ed. 48, and Triangle Candy Co. v. United States, 9 Cir., 144 F.2d 195, 199, 155 A.L.R. 903. We conclude that violating such a misdemeanor statute does not involve moral turpitude. A violation of this section cannot be equated with that of peddling narcotics, which was the crime discussed by the court in Menna v. Menna, 70 App.D.C. 13, 102 F.2d 617.

We conclude that the trial court did not err in declining to permit counsel to cross examine the witness Stevens.

The judgment is affirmed.