[Crim. No. 5564. First Dist., Div. Two. June 28, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WESLEY ROY GANT et al., Defendants and Appellants.

Louis A. Romero, in pro. per., Richard M. Bryan and Lindsay M. Mickles, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Edward P. O'Brien and John T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

BRAY, J.*—In a grand jury indictment, defendants Gant and Romero, together with Patrick M. Buckman, Salvatore S. Polani and Winston Major, were charged with conspiracy (Pen. Code, § 182) to commit burglary and also with burglary (Pen. Code, § 459). The indictment charged that all were armed with deadly weapons during the commission of the alleged crimes.[1]

A jury acquitted Buckman on both counts; found Polani guilty on both counts and that he was armed with a deadly weapon; found Gant and Major guilty on both counts and that they were armed. Romero was found not guilty of conspiracy but guilty of burglary and being armed. All defendants moved for new trials, which motions were denied. Defendants Gant and Romero appeal from the judgment entered on the jury verdicts.[2]

QUESTIONS PRESENTED

1. The effect of *Aranda* on the motions for severance and the admission of codefendants' statements.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1] Gant, Major and Romero were also charged with possession of firearms by ex-convicts (§ 12021, Pen. Code). These charges were later dismissed. Gant was charged with six prior felony convictions; Major with two; Romero with three. All were admitted.

[2] Polani and Major also appealed. Their appeals were dismissed.

2. Other grounds alleged for severance.

3. Refusal of severance of the burglary and conspiracy charges.

4. Instruction on circumstantial evidence.

5. Admission of evidence of Gant's character.

6. Was the evidence taken from Romero's car the result of an illegal search and seizure?

7. Was Romero's acquittal of the conspiracy charge factually inconsistent with his conviction of the burglary charge?

### EVIDENCE

In early 1965, Robert Worthington, a Marin County contractor who had been employed to perform certain construction work at Sally Stanford's restaurant in Sausalito, "The Valhalla," met with Polani, a San Francisco police officer whom he had known for several years. Polani showed Worthington a stolen diamond watch bracelet which he said was worth $15,000 and asked him to ask Miss Stanford if she would pay $1,000 for it. While the two men were in the Valhalla, Polani noticed a safe in the liquor room and told Worthington he had some men who could get into it in 30 seconds. Worthington replied that Miss Stanford did not keep much in the safe.

Following this meeting, Worthington informed Mr. Midyett, the chief criminal investigator for the Marin district attorney's office, of Polani's remarks. Worthington showed the bracelet to Miss Stanford, who declined to purchase it. He then returned it to Polani.

At a later meeting, Polani told Worthington that he knew two safecrackers who could "take" Sally Stanford's residence.[3] Several meetings between Polani and Worthington followed concerning the robbing of the residence by these men, one of whom was named "Bill" (presumably defendant Major).

In the meantime, Worthington had conferred with Midyett and two San Francisco police officers and had agreed to cooperate with Polani and attempt to learn who his confederates were.

Worthington told Polani that the residence would be vacant on April 6. Polani stated that another policeman (presumably Buckman) would work with Polani the night of the burglary and would drive in a car behind the safe men to be sure that they did not cheat on the count. It was agreed that Worthing-

---

[3]These two conversations were admitted only against Polani.

ton and two subcontractors would enter the building on the night selected, ostensibly to estimate certain construction work. Before leaving, Worthington would jam the door lock with cotton and Scotch tape. When Polani's men entered, they were to remove the cotton and tape. Polani and his partner would be waiting outside.

On the evening of April 6, the residence was under police surveillance both inside and outside. About 7:30 p.m., Worthington and another man arrived at the residence, having previously obtained the key from Miss Stanford. On leaving, Worthington jammed the door lock with Scotch tape and cotton.

Police officers observed defendant Major walk past the residence to the corner and then disappear from view. Shortly thereafter, a car driven by Buckman passed the residence, returned and parked nearby. Another car then drove past two or three times and stopped. Major entered and it drove off. Shortly thereafter Major, Gant and Romero walked toward the house, Major and Romero carrying grips.[4]

Officers inside the residence heard a telephone ring for a long duration. They did not answer. After the telephone stopped ringing the front door was opened and two men carrying grips entered. One of the men walked towards the stairs and the other, Romero, put down his grip and walked toward the front door. At this point an officer called to the man carrying the grip upstairs, "Halt, we are the Police." Romero started running for the front door and was apprehended. Gant ran out the front door and was caught by the police in front of the house. Gant was wearing cloth gloves.

A .38 caliber revolver found lying on the floor where Romero had been standing was identified as one which had been given to Major the day before. During a search of Romero, one of the officers felt bullets in his pocket. Romero was taken upstairs and searched. He was wearing one black leather glove. In his pocket were found six .38 caliber bullets and a small amount of cotton.

In the meantime, Polani and Buckman were apprehended in a car parked at the corner.

At the Stanford residence, after having first been advised of his constitutional rights, Gant was questioned. He stated that he had obtained the tools in the grip at Sears Roebuck at

---

[4]Although the police officer who was observing the defendants testified that Major and Gant were carrying the grips, Major testified it was he and Romero who were doing so.

4 p.m., was picked up by Romero in a Cadillac at 6 p.m., and had parked a block from the Stanford home. An electric drill had been brought in case they ran into trouble on the safe. Major had arrived separately and had met him at the corner. Gant stated that he did not know the identity of the two men who had been arrested outside. He said the job was Major's and he had just been called in that day. Gant had two drills in his pocket. The grips which Major and Romero had carried contained safecracking tools.

At the Hall of Justice, Romero was questioned after being advised of his constitutional rights. He stated that he came to the residence in a Cadillac borrowed from a friend named Haines and parked the car. He refused to say anything further.

Three vehicles parked in the vicinity of the residence were towed to the Hall of Justice and impounded. Subsequently the trunk of Romero's car was searched. It contained a box of cartridges of the same brand, caliber and size as those found in Romero's pocket and in the gun found at the scene.

Buckman denied all knowledge of the burglary and stated that on the day of the burglary, he and Polani, who was his partner in a private detective agency, were working on a divorce case and a case involving guarding an individual who had been released on bail.

Polani testified that the burglary was Worthington's idea and that Polani pretended to cooperate with him for the sole purpose of apprehending him in the commission of the crime.

Major's defense was that he was entrapped by Polani and Worthington; that it was not until April 6 that he agreed to participate in the burglary and that he had done so while under the influence of alcohol and as a result of Polani's repeated urgings. After he had agreed to participate, he contacted Gant, who agreed to participate. Gant in turn persuaded Romero to drive him but assured Major that Romero had not been told any of the details of the burglary and that there was no danger of his saying anything.

1. Effect of *Aranda*.

On this appeal, in March 1967, we affirmed *(Cal.App.) [57 Cal.Rptr. 413] judgment convicting appellants Wesley Roy Gant and Louis A. Romero of burglary (§ 459, Pen. Code), and Gant (together with one Major) of conspiracy to commit burglary (§ 182, Pen. Code).

*A hearing was granted by the Supreme Court, and the matter was retransferred to this court with directions.

At the trial, relying upon *People* v. *Aranda* (1965) 63 Cal. 2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], both defendants moved for severance of the trials. The trial court denied the motions. In upholding the trial court's ruling, this court, on the appeal, held that *Aranda,* which was decided subsequently to the trial of the case at bench, was intended to have a prospective application only, and that, as this trial had taken place prior to that decision, it could not apply to this case. After the filing of our decision, the Supreme Court in *People* v. *Charles* (1967) 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d 545], held that the rules established in *Aranda* governing joint trials in which one defendant's extrajudicial statement implicates a codefendant, were available to defendants whose judgments of conviction were still on appeal (as was the appeal in the instant case), even though they were tried before the date of the *Aranda* decision (p. 332).

On May 10, 1967, our Supreme Court, on its own motion, ordered a hearing on our decision, transferred this cause to it, and then retransferred it to our court "with directions to redetermine the appeal in the light of *People* v. *Charles*" *supra.* At our request, the parties have briefed the questions applicable to this redetermination.

In redetermining the appeal in light of *Charles,* as instructed by the Supreme Court, we must have two considerations in mind, one, that decision's effect on the denial of the motion for severance and, two, the effect on the convictions of defendants of the extrajudicial statements of codefendants. Although no objection was made to the introduction of these statements on *Aranda* grounds (obviously there could not have been any such objection, as *Aranda* had not yet been decided), that fact does not relieve this court of the duty of looking into the matter as if such objection had been made. See *Aranda,* page 523, where it was held that the failure to object to the admission of evidence violative of *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], did not preclude the raising of that objection on appeal where the case was tried prior to the *Escobedo* decision.

As held in *Charles* "failure to adhere to the *Aranda* procedure constitutes reversible error only if it causes prejudice" (p. 337). Our duty, then, is to determine whether the failure to apply *Aranda* was prejudicial to either defendant.

As the *Aranda* rules apply to this appeal, and if the attention of the trial court had been called to the fact that

statements of codefendants implicating other codefendants were to be offered at the trial, the court might have been under a duty to consider the motions in the light of those rules. We have so considered them and have concluded that the references to codefendants in these statements could not possibly have been prejudicial and hence if the denial of the motions were error, it would not have been prejudicial.

So far as Gant is concerned, no post-conspiracy statement implicating him was introduced. The statements of codefendant Polani, if they may be construed as implicating Gant, were made in furtherance of the conspiracy, and would have been admissible against Gant, even if he had a separate trial (see *People* v. *Hardeman* (1966) 244 Cal.App.2d 1, 39 [53 Cal.Rptr. 168]). Defendant Gant appears to contend that the fact that the court did not sentence him on the conspiracy conviction, somehow makes nonadmissible Polani's statement concerning him made during the existence of the conspiracy.[5] This is a *non sequitur*. Admissibility of evidence is not determined by the outcome of the trial and particularly whether on conviction a sentence is imposed, *Aranda* does not change the rule as to the admission of statements by a coconspirator concerning a fellow conspirator made during the conspiracy.

Gant's post-conspiracy statement to the inspector, although making a passing reference to Romero, could not possibly have harmed Romero. Gant merely stated that Romero had picked him up in the Cadillac and that the auto was later parked on Broadway. Such statement is consistent with Romero's testimony that he was not a party to the conspiracy but was innocently performing a transportation service. Romero was acquitted on the conspiracy charge and the statement does not implicate him in the burglary. What convicted Romero on the substantive charge was his entry into the Stanford house with a suitcase of burglary tools, plus the fact that in the car driven by Romero were found cartridges of the same brand, caliber and size as were found in Romero's pocket and in the gun found in the Stanford hall at the spot where Romero had been standing. Here, the so-called incriminating statements concerning codefendants were practically identical with the statements made by the codefendants them-

---

[5]Had the court sentenced Gant on his conviction of both burglary and conspiracy to commit burglary, such sentence would have constituted double punishment prohibited by section 654, Penal Code. See *People* v. *Keller* (1963) 212 Cal.App.2d 210, 220 [27 Cal.Rptr. 805].

selves. Thus, there could have been no prejudice (see *People* v. *Perrin* (1967) 247 Cal.App.2d 838, 845 [55 Cal.Rptr. 847]).

■ As the statements were not prejudicial, there was no error, because of the *Aranda* rules, in the court denying the motions for severance. The other contention concerning the denial of the motions for severance are fully answered hereafter in this opinion.

We have fully considered the application of *Aranda* and *Charles* to this cause and declare a belief, because of the conclusive evidence of the guilt of both defendants, that we find no reasonable probability in this case that a jury would have returned more favorable verdicts for defendants, or either of them, if the statements of the codefendants had not been admitted.

2. Severance. Other grounds alleged.

Both defendants claim that the joint trial was highly prejudicial to them primarily because of the conversations between Polani and Worthington in which Polani was shown to be a vicious and lawless individual, and Buckman and the two safecrackers were described by Polani as being hardened and experienced criminals. Both defendants contended that in separate trials most of this evidence would have been inadmissible.

■ Section 1098 of the Penal Code provides in pertinent part that "when two or more defendants are jointly charged with any public offense, . . . they must be tried jointly, unless the court order separate trials." It is settled that the trial court has full discretion in determining a motion for severance and that an appellate court will not ordinarily disturb that discretion and will look only at the facts existing at the time of the motion and will not consider events that occurred afterwards (*People* v. *Clark* (1965) 62 Cal.2d 870, 883 [44 Cal.Rptr. 784, 402 P.2d 856] ; *People* v. *Eudy* (1938) 12 Cal.2d 41 [82 P.2d 359]).

In the instant case, Gant's and Romero's extrajudicial statements were admitted only against them. ■ Polani's conversations with Worthington were in furtherance of the conspiracy and were thus binding upon all the defendants if there was sufficient evidence to connect them with the conspiracy (*People* v. *Hardeman* (1966) 244 Cal.App.2d 1 [53 Cal.Rptr. 168].) ■ The record clearly contains sufficient evidence connecting both defendants with the conspiracy. Major's testimony at the trial indicates that Gant entered the conspiracy on the day of the burglary. However, Polani's

conversations with Worthington indicate that Major and another safecracker were "alerted" and presumably joined the conspiracy at a much earlier stage. Polani told Worthington that the two safecrackers were associates, one of whom had trained the other. The prosecutor was able to establish during cross-examination of Major that he had known Gant for 25 or 30 years, had had a "working acquaintance" with him for many years and had reason to believe that he would know where to obtain the type of burglar's tools which would be needed on April 6. When asked what he meant by a "working acquaintance," Major stated "That we had been arrested, although not together, but separately once." This evidence was clearly sufficient to support a finding that Gant was one of the two safecrackers described by Polani and that he had joined the conspiracy sometime prior to March 24. The evidence connecting Romero to the conspiracy showed that he drove to the Stanford residence with Gant, arriving at the hour when the parties had agreed to commit the burglary. He carried a grip containing burglary tools into the premises and removed from the door lock the cotton which Worthington had agreed to place there. This evidence clearly suggests that he joined the conspiracy sometime before he drove to the premises with Gant. In addition, Polani's conversation with Worthington on March 30, 1965, wherein he referred to "this other guy" who would be with "them," indicates that even at that date, three men rather than two were expected to enter the Stanford residence.

In the light of the foregoing, the Polani-Worthington conversations, which were clearly in furtherance of the conspiracy, would appear to have been binding upon all the defendants and could accordingly have been admitted against them even if they had been granted separate trials.

 With regard to the extrajudicial statements of Gant and Romero, which were admitted against the declarant only, Romero's statement was in no way damaging to Gant. Although Gant's statement did implicate Romero, the strength of the evidence against Romero negates any inference that the jury disregarded the court's admonition and based its conviction upon Gant's statement. Romero was acquitted of conspiracy and the evidence connecting him with the burglary was overwhelming. It is equally unlikely that the evidence of the criminality and depravity of defendants' codefendants had any real effect upon the verdicts against them.

 Romero's contention that the failure to sever the

trials was unfair to him is mainly based upon his claim that the evidence concerning the bad character of the codefendants would not have been before the jury were he tried alone. It is not reasonably probable that had he been tried alone, he would not have been convicted. Whatever the background of the codefendants, the fact was they undeniably were engaged in a burglary, that Romero carried into the house for them a part of the tools necessary to their trade, was connected to the gun, its bullets, to the cotton used to enable the entry to be made, and he wore a glove. Thus, had his companions led exemplary lives theretofore, that fact would not have changed the fact that this night they were burglars engaged in a burglary and that Romero was aiding them.

Both defendants were apprehended by the police immediately after they had effected illegal entry to a private residence. Gant was wearing cotton gloves, and Romero was carrying a grip containing burglary tools. A loaded gun was found at the scene of the arrest. In view of the strength of this evidence, it cannot be said that defendants' convictions were probably based upon evidence which was admissible only against their codefendants or that the joint trial deprived them of due process of law.

Gant contends that a tape recording of a telephone conversation between Polani and Worthington should have been excluded or at least the profane and obscene portions thereof should have been deleted. There was no abuse of discretion by the court in these respects as the evidence was highly material and the court could well have concluded that the deletions sought by Gant would destroy the meaning and the continuity of the conversation.

3. Severance of Charges.

The court denied the motions of both defendants to sever the conspiracy and burglary charges, which motions were made on the alleged ground that the Polani-Worthington conversations could not have been considered on the burglary charge if the two charges had been severed before trial. There is no merit to this contention, since the evidence that both defendants were guilty of burglary is so strong that they cannot be deemed to have suffered prejudice from the evidence complained of. In any event, the crimes of conspiracy and burglary are separate and distinct offenses, and a defendant may properly be charged with and convicted of

both (*People* v. *Hoyt* (1942) 20 Cal.2d 306, 317 [125 P.2d 29]).

4. Instruction on Circumstantial Evidence.

 Romero requested California Jury Instruction, Criminal, No. 27, which reads: ''I instruct you further that you are not permitted, on circumstantial evidence alone, or when the case of the People rests substantially on circumstantial evidence to find the defendant guilty of the [any] crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion.''[6] The instruction was not given.

 Specific intent is an essential element of burglary (Pen. Code, § 459). When the evidence of intent is largely circumstantial, an instruction embodying the subject matter of California Jury Instruction, Criminal, No. 27, must be given.

 In *People* v. *Rayol* (1944) 65 Cal.App.2d 462 [150 P.2d 812]), it was held that instructions such as the court gave in the case at bench do not satisfy the defendant's right to an instruction of the type of California Jury Instruction, Criminal, No. 27.

The instruction should have been given. However, reversal is required only if the error in not giving it was prejudicial (*People* v. *Green* (1964) 228 Cal.App.2d 437, 440 [39 Cal. Rptr. 612]). Romero contends that the evidence concerning his entrance to the residence was circumstantial and was inconsistent with any hypothesis other than that he did not have an intent to commit burglary. He did not testify but relies on the testimony of Major for his contention that he entered with innocent intent. Major testified that Gant brought Romero along at the last moment as a driver and that Romero did not know anything about the contemplated burglary; that Romero carried one of the grips into the residence only because Gant had a ''catch'' in his shoulder and that Romero intended to leave the premises immediately after he put down the grip. One of the police officers testified that one of the men who carried a grip into the house, immediately set it on the floor and headed for the door. Romero also contends that as he was acquitted of conspiracy, the jury must have given credence to Major's testimony in this respect. This is a

---

[6]Apparently the judge intended to give this instruction, as when asked just before the jury retired, he stated that he had given it.

*non sequitur*, for if the jury believed Major's story of Romero's innocence, they would not have convicted Romero of burglary. Moreover, the evidence of Romero's burglarious intent was strong. Romero had in his possession a small amount of cotton (obviously that which Worthington had placed in the door). The .38 caliber revolver was lying on the floor near where Romero was standing, and he had in his pockets bullets which fitted the gun. He was wearing a black leather glove. Major's testimony fails to provide any explanation for the fact that Romero was apparently carrying a gun which Major had obtained the day before the burglary and was carrying ammunition for it. All this evidence was completely inconsistent with any hypothesis that Romero believed that his companions were effecting a lawful entry to the Stanford residence.

5. Gant's Character.

Pointing out the well-established rule that unless a defendant places his character and prior criminal acts in issue, evidence of bad character or of prior crimes is not admissible (Witkin, Cal. Evidence (1958), § 128, p. 152), defendant contends that this rule was violated, as hereinafter set forth.

In his opening statement and in questioning Worthington about his early conversations with Polani, the prosecutor brought out that Polani knew two "safe men" whom he could locate to burglarize the Stanford safe, and that these men had served time in prison and had been questioned by the police on every "big job" in San Francisco. Inspector Valentine, who had handled over 1,200 safe burglaries, testified that he knew Major for some time as a result of his work on the safe burglary detail and had known Gant for the same length of time, and that he knew that Gant and Major associated with each other. Gant contends that by this testimony the prosecution was inferring that Gant was one of the safe men referred to in the Polani-Worthington conversations.

No objection was made to any of this testimony. Gant thereby waived his right to complain on appeal. Moreover, evidence of other crimes is not inadmissible if it tends logically, naturally and by reasonable inference to establish any fact material for the prosecution (*People v. Scott* (1963) 218 Cal.App.2d 249, 253 [32 Cal.Rptr. 225]). Here it is apparent that the evidence complained of was not introduced to show the bad character of Gant but to establish that he was one of the safecrackers who had been

described by Polani and who had entered the conspiracy long before the burglary was committed.

6. Search of Car.

 Romero was arrested inside the residence shortly after 8 p.m. He told one of the officers that he had parked the car which he had driven to the residence about two blocks away. After Romero had been taken to the Hall of Justice, the three cars parked near the residence were towed to the Hall and impounded, "to preserve the automobiles" and to process them for fingerprints. At approximately 11:15 p.m. that evening, Romero's car was searched and the box of cartridges found therein. Relying on *Preston* v. *United States* (1964) 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881]; *People* v. *Burke* (1964) 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67]; and *People* v. *Cruz* (1964) 61 Cal.2d 861 [40 Cal.Rptr. 841, 395 P.2d 889], which hold that a search of an automobile away from the scene of an arrest is an unlawful search, defendant Romero contends that the search of his automobile and the seizure of the cartridges were unlawful.

In February 1967, the United States Supreme Court decided *Cooper* v. *California*, 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788], which was on writ of certiorari after decision by the California Court of Appeal in *People* v. *Cooper* (1965) 234 Cal.App.2d 587 [44 Cal.Rptr. 483].

Cooper had been arrested for selling heroin. His conviction rested in part on the introduction in evidence of a small piece of a brown paper sack seized by police without a warrant from the glove compartment of an automobile which the police had impounded under section 11611, California Health and Safety Code (forfeiture of a motor vehicle used to transport a narcotic) and were holding in a garage. The search occurred a week after the arrest. The California court (hearing denied by the California Supreme Court) had held under the authority of *Preston* v. *United States* (1964) 376 U.S. 364 [11 L.Ed. 2d 777, 84 S.Ct. 881], that the search and seizure violated the Fourth Amendment of the United States Constitution, but that under the then section 4½ of article VI of the California Constitution, the error was harmless. The United States Supreme Court stated that in *Preston* it had been made clear "that whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case and pointed out, in particular, that searches of cars that are constantly movable may make

the search of a car without a warrant a reasonable one although the result might be the opposite in a search of a home, a store or other fixed piece of property. 376 U.S., at 366-367 [376 U.S. 364 (11 L.Ed.2d 777, 84 S.Ct. 881)]." (P. 59 [17 L.Ed.2d at p. 732, 87 S.Ct. at p. 790].)

The Court distinguished *Preston* as being based on an arrest for vagrancy which did not justify the seizure of an automobile, and held that because of the forfeiture section of the California Code, the seizure and removal of the automobile in *Cooper* to the garage was not illegal and that it would be unreasonable to hold that the police, having to retain the automobile in their garage to await forfeiture proceedings, "had no right, even for their own protection, to search it" (pp. 61-62 [17 L.Ed.2d at p. 733, 87 S.Ct. at p. 791]).

The Court then said: "Our holding, of course, does not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so. And when such state standards alone have been violated, the State is free, without review by us, to apply its own state harmless-error rule to such errors of state law. There being no federal constitutional error here, there is no need for us to determine whether the lower court properly applied its state harmless-error rule" (p. 62 [17 L.Ed.2d at p. 734, 87 S.Ct. at p. 791]).[7]

Assuming that the search and seizure of the Romero automobile was illegal, the error was, as was the situation in the *Cooper* case, harmless. The bullets found in the car were identical to those found in Romero's pocket. He makes no claim that the search of his pockets was illegal. The evidence taken from the car was merely cumulative. It is clear beyond a reasonable doubt that the verdict as to Romero would not have been different had the box of cartridges not been admitted.

### 7. Were the Verdicts Inconsistent?

 Romero contends that in finding him not guilty of conspiracy but guilty of burglary, the jury returned inconsistent verdicts. Defendant correctly points out that the only conspiracy charge in the indictment which pertained to him was that he conspired and agreed with other persons to com-

---

[7]See *People* v. *Teale* (1965) 63 Cal.2d 178, 196-197 [45 Cal.Rptr. 729, 404 P.2d 209], holding that the violation of the rule of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (adverse comment and instruction on failure of a defendant to testify) was not prejudicial under the circumstances of the case.

mit burglary and, in furtherance of said conspiracy, he did enter the Stanford residence. Romero reasons that since the evidence conclusively establishes that he did in fact enter the Stanford residence, his acquittal of the conspiracy charge shows that the jury must have found that he did not make such entry in furtherance of any agreement to commit a burglary. It follows, according to Romero, that he was found to have entered the premises with an innocent, nonburglarious intent and that he accordingly should have been acquitted of the burglary charge because he did not possess the specific intent which is an essential element of that offense.

This contention cannot be upheld, since the jury could have concluded, on the basis of Major's testimony and the other evidence discussed under the preceding argument, that although Romero never actually *agreed* to participate in the burglary and merely offered to drive Gant to the premises, he became aware of his companion's burglarious intent sometime prior to entering the Stanford premises and made his own independent decision to aid them in accomplishing the burglary.

Section 954, Penal Code, provides in pertinent part: "An acquittal of one or more counts shall not be deemed an acquittal of any other count." "Each count in a multiple count information stands on its own merit and the disposition of one count therein has no effect on the other counts." (*People* v. *Hernandez* (1966) 242 Cal.App.2d 351, 358 [51 Cal. Rptr. 385].) As a consequence, the Romero verdict on burglary, which is a distinct offense from conspiracy with different elements, stands on the strong evidence hereinbefore set forth that Romero was actually participating in the burglary even if he may not have agreed to do so.

Judgment affirmed.

Agee, Acting P. J., and Taylor, J., concurred.

The petition of appellant Romero for a hearing by the Supreme Court was denied September 21, 1967.