Melvin T. HANSEN and Eugene W. Johnson, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18632.

United States Court of Appeals Ninth Circuit.

Dec. 13, 1963.

**154**

Michael J. Hemovich, Spokane, Wash., and Thomas A. Mitchell, Coeur d'Alene, Idaho, for appellants.

Frank R. Freeman, U. S. Atty., and Carroll D. Gray, Asst. U. S. Atty., Spokane, Wash., for appellee.

Before POPE, HAMLEY and BROWNING, Circuit Judges.

BROWNING, Circuit Judge:

Appellants Melvin T. Hansen and Eugene W. Johnson, with five others (Arthur D. Jack, Donald V. Farley, Clyde O. Gose, Robert F. MacGill, and Jerry W. Trayer) were charged with conspiring[1] to transport forged securities in interstate commerce.[2] Jack, MacGill, and Trayer pleaded guilty. Gose was acquitted. Hansen, Johnson, and Farley were convicted; Farley did not appeal.

The forged securities were money orders drawn on the Idaho First National Bank, Coeur d'Alene, Idaho. They were printed in Reno, Nevada, and passed in Nevada and various other states, including Idaho and Washington.

■ 1. Hansen sold to Jack plates and a negative reproduced from a genuine money order of the Idaho First National Bank furnished to Hansen by Jack for the purpose. Hansen does not deny that the jury could infer knowledge on his part that Jack intended to make counterfeit money orders from the plates and negative and negotiate them,[3] but contends that it was sheer speculation for the jury to conclude that Hansen knew the bogus money orders were to move in interstate commerce.

To Hansen's knowledge, Jack came from Reno, Nevada, to get the plates and negative from Hansen in Pacifica, California, and returned to Reno with them. Hansen knew that the bogus money orders were drawn on an Idaho bank. He also knew that if cashed in Nevada, or any state other than Idaho, the forged money orders would necessarily move in interstate commerce to the drawee bank for collection. It was proper for the jury to conclude that Hansen intended the

---

1. 18 U.S.C.A. § 371: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. 18 U.S.C.A. § 2314: "Whoever with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities, knowing the same to have been falsely made, forged, altered, or counterfeited;
  \* \* \* \*
  Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

3. No other inference seems possible. Jack presumably acquired the plates and negative from Hansen for some purpose, and claimed no connection with the Idaho National Bank which might give rise to a legitimate one. The Bank was in Idaho, Jack was from Reno, Nevada, and Hansen lived in Pacifica, near San Francisco, California, and was not a commercial printer. Hansen was paid $600 for the plates and negative, although the commercial rate for printing 500 money orders was about $50. Negotiations for completion and delivery of the plates and negative were carried on by long distance telephone and at meetings at the Ambassador Bar in San Francisco, and at Winter's Bar, Pacifica, California, Jack and Trayer traveling from Reno for the meetings. Hansen delivered the plates and negative to Jack in the back room of Winter's Bar.

interstate transportation of bogus money orders which was the probable (and actual) consequence of his act of furnishing Jack with the plates and negative.[4]

■ 2. Hansen argues that evidence that Jack paid Hansen two hundred dollars on August 9, 1961, was improperly submitted to the jury as proof of the overt act "to effect the object of the conspiracy," required by the statute,[5] because the incident was not related to the alleged conspiracy and occurred after it had ended.

■ There was evidence that the two hundred dollar payment was made as part of Jack's effort to secure through Hansen a forged commercial pilot's license for use as identification in cashing the money orders, and that these efforts continued at least until after Jack and Johnson visited Hansen in Pacifica sometime between August 10th and 20th. If this evidence were accepted, the payment was clearly a step in effectuating the continuing conspiratorial purpose to negotiate the bogus money orders. Although there was also testimony that the incident was not related to the conspiracy, and that it occurred after further efforts to negotiate the counterfeit money orders had been abandoned, this contrary evidence simply created a conflict for the jury to resolve.

3. Gose pleaded not guilty and went to trial with appellants and Farley. In the course of the government's presentation, Gose offered himself as a government witness. His offer was accepted, and he testified in detail regarding the alleged conspiracy, but asserted that he participated only to expose the crime. Both appellants contend that it was error to permit Gose to testify, and a mistrial should have been allowed.

■ A defendant may testify as a witness for the government against his co-defendants.[6] Perhaps some prejudice results to co-defendants from the very fact that one of their number elects to become a witness against them. But to hold that this prejudice, without more, requires the granting of a mistrial, would simply be to deny the validity of the rule permitting a defendant to become a government witness. In the present case there is no showing of any additional circumstances which might render denial of appellants' motions for mistrial, and for a new trial, an abuse of discretion.[7]

■ 4. Gose was permitted to testify, over objection, to statements made to him by Jack implicating Hansen and Johnson in the conspiratorial scheme. In support of their exceptions, appellants rely on statements in Thomas v. United States, 57 F.2d 1039, 1041 (10th Cir. 1932), and Kuhn v. United States, 26 F.2d 463, 464 (9th Cir. 1928), that declarations by one conspirator to another are not competent to establish the connection of a third person with the conspiracy. But this language, in context, is simply a reference to the requirement that each defendant be connected with the alleged conspiracy by evidence independent of the statements of co-conspirators before

4. Pereira v. United States, 347 U.S. 1, 8–9, 12, 74 S.Ct. 358, 98 L.Ed. 435 (1954); United States v. Sheridan, 329 U.S. 379, 391, 67 S.Ct. 332, 91 L.Ed. 359 (1946); Baty v. United States, 275 F.2d 310 (9th Cir. 1960); Roddy v. United States, 262 F.2d 308, 310 (7th Cir. 1958).

5. Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946); Hyde v. United States, 225 U.S. 347, 359, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).

6. See, e. g., Brown v. United States, 253 F.2d 587 (5th Cir. 1958); Rickey v. United States, 242 F.2d 583, 586 (5th Cir. 1957); Colt v. United States, 160

F.2d 650, 651 (5th Cir. 1947); Brown v. United States, 56 F.2d 997, 999 (9th Cir. 1932).

7. Compare, e. g., Heitler v. United States, 244 Fed. 140, 142 (7th Cir. 1917), in ment that a defendant will testify for the which the court pointed out that an agreement that a defendant will testify for the government "must not be employed for the purpose, or with the probable effect, of embarrassing other defendants in the conduct of their defense, through leading them to believe that their codefendants are in good faith defending against the same charge, when in truth and to the knowledge of the prosecutor they are not."

the latter are admissible against him.[8] In the present case there was sufficient independent evidence to establish prima facie[9] the participation of each of the appellants in the conspiracy.[10]

5. Appellants also argue that Gose's testimony was inadmissible because, by his own account, his participation in the conspiracy was feigned. Gose was not the declarant but only a witness to the declarations. It is the declarant and those sought to be bound by his statements, and not the witness, who must be shown to be co-conspirators to render declarations of one admissible against the others.

6. Commission by a conspirator of an overt act to effect the object of the conspiracy is an essential element of the offense charged.[11] The indictment set forth ten such acts, the first of which was that Gose introduced Trayer to Jack at a time and place alleged. Appellants argue that because Gose was acquitted, his act could not constitute the overt act essential to the conviction of the remaining defendants,[12] and since the jury was instructed that commission of any one of the overt acts alleged was sufficient, reversal is required.

The short answer is that the jury was also instructed that to satisfy the statute the overt act must be committed in furtherance of the object of the conspiracy and by a person who was a party to it.[13] If the jury acquitted Gose because it concluded he was not a party to the conspiracy and had not acted in furtherance

8. See, e. g., Glasser v. United States, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ; Carbo v. United States, 314 F.2d 718, 735 (9th Cir. 1963) ; Beatrice Foods Co. v. United States, 312 F.2d 29, 40–41 (8th Cir. 1963) ; Dennis v. United States, 302 F.2d 5, 10 (10th Cir. 1962) ; Tripp v. United States, 295 F.2d 418, 422 (10th Cir. 1961).

9. As Judge Merrill recently stated in Carbo v. United States, 314 F.2d 718, 737 (9th Cir. 1963), "the test is not whether the defendants' connection had by independent evidence been proved beyond a reasonable doubt, but whether, accepting the independent evidence as credible, the judge is satisfied that a prima facie case (one which would support a finding) has been made. Thereafter it is the jury's function to determine whether the evidence, including the declarations, is credible and convincing beyond a reasonable doubt."

10. Money from Johnson's feed business was used to pay Hansen for the plates and negative, and to pay Trayer for his services in negotiating with Hansen and arranging to have the bogus money orders printed. Johnson arrived in Reno when the counterfeit money orders were ready for circulation. He met with Jack and Gose, and a conversation ensued concerning a plan to have Johnson take "a crew" of persons to Lake Tahoe to pass the bogus money orders. Johnson took possession of some of the forged money orders. He was seen in the company of Jack, Farley, and two girls who were shown by independent evidence to have been engaged at the time in passing the money orders. Johnson later met with Jack and Gose in Coeur d'Alene, Idaho, and participated actively in a discussion of the possibility of passing some of the money orders in Canada. Between June 30, 1961, and September 10, 1961, the approximate period of the conspiracy, more than 50 long distance calls were made between Johnson's telephone number and the telephone numbers of Jack, Hansen, and Gose.

Hansen took the stand, admitted the various conversations and meetings with Jack, Trayer, and Johnson which have been described briefly in the body of the opinion. He denied only that he actually produced the plates and negative requested by Jack and Trayer, or received $600 from the former. He admitted the efforts of Jack and Johnson to secure a false pilot's license through him, and admitted receiving the $200 payment of August 9th from Jack, but testified that the efforts were unavailing and that the $200 was for "nothing."

11. See note 3.

12. See Yates v. United States, 354 U.S. 298, 334, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957).

13. The jury was instructed that in order to convict they must find that each defendant joined in the conspiracy alleged and "that one of the defendants engaged in any such plan, combination or agreement, knowingly performed at least one of the alleged overt acts in furtherance of the object or purpose of the conspiracy * * *"; "that thereafter one or more of the conspirators knowingly committed in furtherance of an object or purpose of the conspiracy one or more of the overt acts charged * * *"; and "by the

of its purpose, then under the court's instructions the jury could not have relied upon Gose's overt act in convicting appellants.[14]

7. We have examined appellants' remaining specifications of error, not briefed or argued, and conclude they are without merit.

Affirmed.

term 'overt acts' is meant any act committed by one of the conspirators in an effort to effect or accomplish some object or purpose of the conspiracy."

14. Quite a different question would be presented, of course, if the only overt act alleged and proved were committed by the acquitted defendant.