[Crim. No. 10838. In Bank. Nov. 21, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH LLOYD BRAWLEY and LARRY ANDREW BAKER,
Defendants and Appellants.

**Counsel**

Larry Andrew Baker, in pro. per., Frank G. Prantil and Hubert C. Cavanagh, under appointments by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

**Opinion**

**BURKE, J.**—An indictment was filed charging Kenneth Brawley and Larry Baker with the murder and robbery of Edwin Brewer. A jury found both defendants guilty of first degree murder and first degree robbery and fixed their penalty at death for the murder. The jury also found that Brawley but not Baker was armed with a deadly weapon at the time of the robbery. Motions for a new trial and for reduction of the death penalty were denied, and defendants' automatic appeal is now before us (Pen. Code, § 1239, subd. (b)).

Defendants attack the judgments on various grounds hereafter discussed. We have concluded that the judgments as to guilt should be affirmed but that under the compulsion of *Witherspoon* v. *Illinois,* 391 U. S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the death penalties must be set aside because the jury was chosen by excluding veniremen for cause on a basis that was not permissible under *Witherspoon*. It is therefore necessary that defendants be remanded to the trial court for a new trial limited to the issue of penalty for the murder.

About 3 a.m. on July 23, 1966, the body of Edwin Brewer, a 35-year-old cabdriver, was discovered by the police near his cab behind an apartment house in National City. The police were called by a resident of the apartment house, who found the cab in his parking space about 12:30 a.m. and upon seeing the cab still there a little over an hour later looked inside it and saw a knife and blood.

Decedent worked a 5 p.m. to 3:30 a.m. shift for a cab company and reported for work at his usual time on Friday, July 22. His friend, Mrs. Concetta Floridi, testified that she last saw him about 8:45 p.m. on July 22 when he brought her a few groceries. Evidence was introduced of prior statements by her placing the time she last saw him around an hour later. The last entry in his "trip sheet" showed that he picked up two passengers at 9 p.m., and the space for the time of the completion of the trip was blank.

The autopsy surgeon testified that the cause of the victim's death was multiple stab wounds of the chest, lungs and heart, and thoracic hemorrhages; that there were 18 lacerations, many of which were in the back; and that all of the lacerations "could" have been inflicted by the knife found in the cab. A chemical examination revealed that blood on the knife blade was type O human blood, the same type as that of the decedent.

Fingerprints and a palm print on the cab were identified as those of Brawley, and there was blood "in the fingerprint area" of one of the fingerprints. A footprint a few inches from the victim's body was made by a shoe having the same shape and length of sole and heel as that of a shoe belonging to Brawley, and a witness testified that Brawley was wearing such shoes on the afternoon of July 22.

Brawley and Baker were confined in the disciplinary barracks of the United States Naval Station in San Diego immediately before the time decedent was killed. During the morning of July 21, Brawley asked Stephen Glaze, a sailor confined at the barracks, if he knew where some wire and gloves could be found. (This will be referred to as the first statement.) Glaze replied that he did not but later that same morning upon finding some wire gave it to Brawley and asked what he wanted it for. Brawley answered that "they" were going to choke and kill a cabdriver and take his money; that Brawley and two other men planned to go "AWOL" the following Saturday but "they" decided to go Friday after the 4:45 muster because "they" did not want one member to go along; that "they" were going to go downtown and catch a cab and, after killing the driver and taking his money, go east to Brawley's home. Glaze first testified that during this conversation Brawley did not inform him who the other men were, then testified that he did not remember whether Brawley mentioned Baker's name, and thereafter stated that he recalled it was during the conversation Brawley mentioned Baker's name in connection with going "AWOL." At the same conversation Brawley told Glaze that he would consider "taking [Glaze] along if [Glaze] wanted to go AWOL with them." (The statements at the second conversation will be referred to as the second statement.) When Glaze gave the wire to Brawley, Brawley displayed two pairs of gloves he had obtained.

In the afternoon of the same day Glaze saw Brawley take a knife from the

commissary and heard him say, "This would be better than the wire. We could stab him, slit his throat." (This will be referred to as the third statement.) According to Glaze, the knife Brawley took was the one later found in the cab, and a meat cutter at the commissary testified that the knife found in the cab was one that was missing from the commissary—that he recognized the knife by the way it was sharpened and its general characteristics.

On the evening of July 21 Brawley and Baker were seen talking together at the barracks. Shortly before 4:45 p.m. on July 22 Brawley took the knife and wire from his locker and handed the wire to Baker, and Baker stated, "We won't need this now." Brawley also took gloves from his locker, and he and Baker each put a pair under his clothing. Brawley and Baker were seen together heading toward a bus stop at the base after the 4:45 muster on July 22.

One week after the deceased's body was found Brawley and Baker were arrested together in Illinois. After the arrest an officer took an empty wallet from Baker. Mrs. Floridi identified the wallet as one the decedent carried on the night of his death. She further testified that she had given the wallet to decedent as a gift, that it was an inexpensive one she had purchased at a drugstore, that the distinctive things about the wallet which enabled her to identify it were that it was black and had specified pockets, and that she was "positive" the wallet taken from Baker was the one she gave decedent. The words "buffalo calf" were on the wallet taken from Baker. Mrs. Floridi told an officer that the decedent had a pigskin wallet.

No wallet was found on the decedent's body nor were there any coins on the body except a silver dollar that was part of a belt. There was $12 in bills in his pocket. Mrs. Floridi testified that he had over $30 in his wallet after paying for their dinner between 7:15 and 8:15 p.m. on July 22. She further testified that he carried a changer in which he kept small change and that a changer found in a yard a few blocks from the cab on the morning of July 23, 1966, was the decedent's. No changer was near the decedent.

The only defense witness at the guilt trial was a police officer, who was questioned regarding prior statements of prosecution witnesses. The defense arguments at the guilt trial concerned whether the prosecution had proved guilt beyond a reasonable doubt.

The court granted the prosecution's motion that evidence received at the guilt trial be admitted at the penalty trial, and additional evidence was introduced by the prosecution and Brawley.

*Asserted Error (1) in Denying Motion for Severance Made on the Ground that the Prosecution Would Introduce Evidence of Brawley's*

*Statements to Glaze, (2) in Admitting that Evidence, and (3) in Failing to Give on the Court's Own Motion an Instruction Relating Thereto*

Before the trial Baker made a motion for severance on the ground that the prosecution would introduce testimony by Glaze regarding extrajudicial statements of Brawley that implicated Baker. The motion was opposed by the prosecutor, who indicated that the statements were admissible against both defendants under the coconspirators' exception to the hearsay rule. The court denied the motion, and at the trial the previously recited statements of Brawley to Glaze were testified to by Glaze over objection by Baker.

■ Baker contends that the court erred in denying the motion for severance and admitting the evidence of the extrajudicial statements without deleting all parts implicating him because, assertedly, there was insufficient proof of the existence of a conspiracy apart from the evidence of the extrajudicial statements and the rules in *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], were therefore applicable. ■ Under the *Aranda* rules the court must adopt one of three alternative procedures (namely, effectively delete parts of extrajudicial statement implicating codefendant without prejudice to the declarant, grant severance or exclude extrajudicial statement) when the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant. ■ Those rules were adopted to obviate the risk that the jury would be incapable of following instructions to disregard the statement of a defendant in determining the guilt or innocence of his codefendant. ■ The *Aranda* rules, however, have been held inapplicable if the extrajudicial statements come within the coconspirators' exception to the hearsay rule. (*People* v. *Morales,* 263 Cal.App.2d 368, 374 [69 Cal.Rptr. 402] [cert. den. 393 U.S. 1104 [21 L.Ed.2d 798, 89 S.Ct. 907]]; *People* v. *Gant,* 252 Cal.App.2d 101, 111 [60 Cal.Rptr. 154]; see *In re Domingo,* 268 Cal.App.2d 642, 650 [74 Cal.Rptr. 161].)

Under California authorities at the time of the trial the rule was that where there is prima facie proof of the existence of a conspiracy, testimony regarding a coconspirator's statements made during the conspiracy and in furtherance thereof is admissible against the conspirators as an exception to the hearsay rule (former § 1870, subd. 6, Code Civ. Proc.;[1] *People* v.

---

[1]Former section 1870 provided: "In conformity with the preceding provisions, evidence may be given upon a trial of the following facts: . . . 6. After proof of a conspiracy, the act or declaration of a conspirator against his co-conspirator, and relating to the conspiracy." This section, which was repealed by Statutes 1965, chapter 299, section 58, operative January 1, 1967, governed defendants' trial, which began

*Robinson,* 43 Cal.2d 132, 137 [271 P.2d 865]; *People* v. *Steccone,* 36 Cal.2d 234, 238-240 [223 P.2d 17]; *People* v. *Ferlin,* 203 Cal. 587, 599 [265 P. 230]; *People* v. *Oldham,* 111 Cal. 648, 652 [44 P. 312]; see Witkin, Cal. Evidence (1966) pp. 492-493), and the order of proof is within the sound discretion of the trial court *(People* v. *Robinson, supra,* at p. 137; *People* v. *Ferlin, supra,* at p. 599). Any evidence received by virtue of the foregoing rule "necessarily is received conditionally, for in the final analysis, the jury must first pass judgment on the question as to whether the asserted conspiracy has been proved." *(People* v. *Steccone, supra,* at p. 238; see *People* v. *Talbott,* 65 Cal.App.2d 654, 663 [151 P.2d 317]; *People* v. *Geiger,* 49 Cal. 643, 649.) "If proved to the satisfaction of the jury, the evidence of the acts or declarations of a conspirator, in such circumstances, may be considered." (See *People* v. *Talbott, supra,* 65 Cal.App.2d at p. 663.)

 Here from the recited evidence it is apparent that there was prima facie proof of the existence of a conspiracy apart from the testimony regarding Brawley's statements to Glaze. Baker's contention to the contrary thus lacks merit.

No claim is made that, even if there was adequate proof of a conspiracy, the conspiracy was not in existence when the statements were made, and the recited evidence is sufficient to show it existed at that time.

Nor is any claim made that Brawley's statements were not made in furtherance of the conspiracy. The code section in effect at the time of defendants' trial did not expressly require that the statement be made "in furtherance of the conspiracy" (see former § 1870, subd. 6, Code Civ. Proc.) and the propriety of the requirement has been criticized and questioned (see McBaine, Cal. Evidence Manual (2d ed. 1960) p. 300; Levie, *Hearsay and Conspiracy,* 52 Mich. L.Rev. 1159, 1168-1172). However, cases have long declared that the statement must be in furtherance of the conspiracy in order to be admissible against a conspirator other than the declarant (e.g. *People* v. *Smith,* 151 Cal. 619, 625-626 [91 P. 511]; see *People* v. *Irwin,* 77 Cal. 494, 504 [20 P. 56]; *Callan* v. *Superior Court,* 204 Cal.App.2d 652, 664 [22 Cal.Rptr. 508]; *People* v. *Busby,* 40 Cal.App.2d 193, 198 [104 P.2d 531]), and it may be noted that Evidence Code section 1223, subdivision (a), which became effective after defendants' trial, codified that limitation.

---

in 1966. (Evid. Code, § 12, subd. (b).) Evidence Code section 1223 restates the exception to the hearsay rule formerly contained in section 1870, subdivision 6. (See also Evid. Code, § 403, subd. (c) pertaining to instructions to jury to disregard the conditionally admissible evidence unless it is persuaded of the existence of "the preliminary fact.")

Brawley's first two statements warrant a determination that they were in furtherance of the conspiracy since in the first statement he inquired regarding items that might be used in the robbery and killing, and the second statement could be viewed as an attempt to recruit Glaze as a member of the conspiracy (cf. *Myers* v. *United States* (5th Cir. 1967) 377 F.2d 412, 417-419 [cert. den. 390 U.S. 929 [19 L.Ed.2d 994, 88 S.Ct. 859]]). Whether or not the third statement could be viewed as in furtherance of the conspiracy, the receipt of that statement does not require reversal since the statement manifestly did not contribute to the judgment against Baker. (*Chapman* v. *California*, 386 U.S. 18, 21-24 [17 L.Ed.2d 705, 708-710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Watson*, 46 Cal.2d 818, 835-837 [299 P.2d 243].) Nor does it appear reasonably probable that a result more favorable to Baker would have been reached had a severance been granted. (*People* v. *Massie,* 66 Cal.2d 899, 922-923 [59 Cal.Rptr. 733, 428 P.2d 869].)

■ Baker further contends that his federal constitutional right of confrontation was violated by the receipt of the evidence of Brawley's statements to Glaze. Baker relies upon *Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], which held that the admission at a joint trial of a defendant's extrajudicial confession implicating a codefendant violated the codefendant's right of cross-examination secured by the confrontation clause of the Sixth Amendment despite the giving of limiting instructions.[2] *Bruton* viewed as unacceptable the assumption that juries could follow such instructions. *Bruton* also specifically declared (at p. 128, fn. 3 [20 L.Ed.2d at p. 480]), "There is not before us . . . any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause. [Citations.]"

*Bruton* thus did not decide whether the receipt of statements under the coconspirators' exception to the hearsay rule violates the right of confrontation of another asserted conspirator, and that is the question here presented since, as we have seen, at least Brawley's first two statements to Glaze came within that exception.

*Delaney* v. *United States,* 263 U.S. 586, 590 [68 L.Ed. 462, 465, 44 S.Ct. 206], rejected a contention that the right of confrontation was violated by the receipt at a federal trial of testimony regarding extrajudicial statements by a deceased coconspirator apparently made in furtherance of

---

[2]*Bruton* must be applied retroactively (*Roberts* v. *Russell,* 392 U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921]), and, although *Bruton* involved a federal prosecution, the right of cross-examination secured by the confrontation clause of the Sixth Amendment is, of course, made applicable to the states by the Fourteenth Amendment. (*Roberts* v. *Russell, supra,* at p. 294 [20 L.Ed.2d at p. 1102]; *Pointer* v. *Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].)

the conspiracy. And many federal decisions, without mentioning the right of confrontation, have declared that statements by a conspirator in furtherance of the conspiracy and prior to its termination may be used against a coconspirator (e.g., *Clune* v. *United States,* 159 U.S. 590, 593 [40 L.Ed. 269, 270, 16 S.Ct. 125]; *United States* v. *Santos,* 385 F.2d 43, 44 [cert. den. 390 U.S. 954 [19 L.Ed.2d 1148, 88 S.Ct. 1048]]; *Fisher* v. *United States,* 382 F.2d 31, 33; *Orser* v. *United States,* 362 F.2d 580, 585; *United States* v. *Sapperstein,* 312 F.2d 694, 697-698; see *Delli Paoli* v. *United States,* 352 U.S. 232, 237 [1 L.Ed.2d 278, 282, 77 S.Ct. 294] [overruled on another issue in *Bruton* v. *United States, supra,* 391 U.S. 123]; *Lutwak* v. *United States,* 344 U.S. 604, 617-618 [97 L.Ed. 593, 603-604, 73 S.Ct. 481]; *Krulewitch* v. *United States,* 336 U.S. 440, 443 [93 L.Ed. 790, 794, 69 S.Ct. 716]; *United States* v. *Gooding,* 25 U.S. 460, 468-470 [6 L.Ed. 693, 695-696]; *Delli Paoli* v. *United States,* 1 L.Ed.2d 278, at p. 1778, see anno. at pp. 1781-1784) where there is proof aliunde of the conspiracy (*Glasser* v. *United States,* 315 U.S. 60, 74 [86 L.Ed. 680, 701, 62 S.Ct. 457]). Such proof need only present a prima facie case. (*Carbo* v. *United States,* 314 F.2d 718 [cert. den. 377 U.S. 953 [12 L.Ed.2d 498, 84 S.Ct. 1625], reh. den. 377 U.S. 1010 [12 L.Ed.2d 1058, 84 S.Ct. 902]]; *Downing* v. *United States,* 348 F.2d 594, 600 [cert. den. 382 U.S. 901 [15 L.Ed.2d 155, 86 S.Ct. 235]]; *Hansen* v. *United States,* 326 F.2d 152, 156.)

The coconspirator exception to the hearsay rule has been explained on the theory that the declarant conspirator is an agent of another conspirator (see *Lutwak* v. *United States, supra,* 344 U.S. 604, 617 [97 L.Ed. 593, 603]; 72 Harv. L. Rev. 920, 988) or that the declarations admitted under that exception are likely to be true (see Model Code of Evid., pp. 249, 251; see generally McCormick on Evidence (1954) p. 522) or that since under the criminal law a conspiracy makes each conspirator liable for the acts of another conspirator done in pursuance of the conspiracy the admissions of a coconspirator "may be used to affect the proof against the others, on the same conditions as his acts when used to create their legal liability" (see 4 Wigmore, Evidence (3d ed. 1940) § 1079, p. 127 et seq.; Morgan, *Admissions,* 1 U.C.L.A. L.Rev. 18, 25). Although some have criticized the theories (see, e.g., Note, 113 U.Pa.L.Rev. 741, 754-756; Levie, *Hearsay and Conspiracy,* 52 Mich. L.Rev. 1159, 1163-1164) and questioned the constitutionality of the coconspirators' exception (see, e.g., Note, 113 U. Pa. L.Rev. 741, 754-756), the cited articles recognized that there is or may be a need for such evidence, and the constitutionality of the exception has long been expressly and impliedly recognized.

In *Krulewitch* v. *United States, supra,* 336 U.S. 440, 443, the United States Supreme Court declared, "There are many logical and practical reasons that could be advanced against a special evidentiary rule that

permits out-of-court statements of one conspirator to be used against another. But however cogent these reasons, it is firmly established that where made in furtherance of the objectives of a going conspiracy, such statements are admissible as exceptions to the hearsay rule." It is implicit in the quoted statement, as well as in countless decisions setting forth the coconspirators' exception, that the admission of evidence under that exception does not violate the federal constitutional right of confrontation. (Cf. *Evans* v. *Dutton,* 400 F.2d 826, 828-832 [holding that the defendant's right of confrontation was violated by receipt of a coconspirator's extrajudicial statement under Georgia exception to the hearsay rule (which went beyond the traditional coconspirators' exception) because the denial of confrontation was without rational basis] [appeal pending in U.S. Supreme Ct.].)

It has similarly been recognized that certain other exceptions to the hearsay rule do not violate the Sixth Amendment right of confrontation. (*Tomlin* v. *Beto,* 377 F.2d 276, 277 [official records]; *McDaniel* v. *United States,* 343 F.2d 785, 789 [cert. den. 382 U.S. 826 [15 L.Ed.2d 71, 86 S.Ct. 59]] [official records]; *Mattox* v. *United States,* 156 U.S. 237, 240-244 [39 L.Ed. 409, 410-411, 15 S.Ct. 337] [testimony of deceased witness who has testified at former trial]; see *Pointer* v. *Texas, supra,* 380 U.S. 400, 407 [13 L.Ed.2d 923, 928] [dying declarations and testimony of deceased witness who has testified at a former trial]; 5 Wigmore, Evidence (3d ed. 1940) pp. 127-135; McCormick on Evidence (1954) pp. 486-487.)

Nothing in *Barber* v. *Page,* 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318], compels our concluding that the receipt of evidence under the coconspirators' exception to the hearsay rule violates the right of confrontation of another asserted conspirator. In *Barber* it was held that unless the prosecution has made a good faith effort to obtain the presence of a witness at the trial that witness is not "unavailable" for purposes of the exception to the confrontation requirement pertaining to a witness who is unavailable and has given testimony at a prior judicial proceeding against the same defendant which was subject to cross-examination by that defendant.

And even if it be assumed in the light of cases such as *Bruton* v. *United States, supra,* 391 U.S. 123, that a jury may be incapable of following limiting instructions regarding an asserted coconspirator's statements, the California procedure (whereby upon prima facie proof of a conspiracy the trial court may admit evidence of an asserted coconspirator's statements during the conspiracy and in furtherance thereof but the jury may not consider the statements against another asserted conspirator unless the jury first makes certain findings) does not require our holding that the receipt of such statements violates the right of confrontation of another asserted conspirator. The procedure followed in an least some of the federal courts is

that the trial court alone determines the admissibility of the statements; if the trial court finds that independent of the statements there is prima facie proof of the conspiracy and that the statements were made during the conspiracy and in furtherance thereof and admits the statements, the jury need not be instructed that it also must make certain findings before it may consider the evidence against an asserted conspirator other than the declarant. (E.g., *Carbo* v. *United States* (9th Cir. 1963) *supra,* 314 F.2d 718, 735-738 [cert. den. 377 U.S. 953 [12 L.Ed.2d 498, 84 S.Ct. 1625], reh. den. 377 U.S. 1010 [12 L.Ed.2d 1058, 84 S.Ct. 1903]]; *United States* v. *Ragland* (2d Cir. 1967) 375 F.2d 471, 478 [cert. den. 390 U.S. 925 [19 L.Ed.2d 987, 88 S.Ct. 850]]; *United States* v. *Stadter* (2d Cir. 1964) 336 F.2d 326, 329-333 [cert. den. 380 U.S. 945 [13 L.Ed.2d 964, 85 S.Ct. 1028]]; see *White* v. *United States* (9th Cir. 1968) 394 F.2d 49, 54; *United States* v. *Nuccio* (2d Cir. 1967) 373 F.2d 168, 171-172 [cert. den. 387 U.S. 906 [18 L.Ed.2d 623, 87 S.Ct. 1688]]; *United States* v. *Dennis* (2d Cir. 1950) 183 F.2d 201 [affd. 341 U.S. 494 [95 L.Ed. 1137, 71 S.Ct. 857]]; but see *United States* v. *Kahn* (7th Cir. 1967) 381 F.2d 824, 838-839; *Landers* v. *United States* (5th Cir. 1962) 304 F.2d 577, 582.) Thus the California procedure contains more safeguards for a defendant than the foregoing federal procedure, and if that federal procedure does not violate the confrontation clause of the Sixth Amendment a fortiori neither does the California procedure.

■ Baker further contends that in view of the evidence of Brawley's statements to Glaze the court erred in failing to give on its own motion an instruction such as CALJIC 935 (Revised), which reads, "Any evidence of an alleged conspirator's act or declaration in furtherance of the conspiracy made outside this trial shall not be considered against another alleged conspirator, unless you shall first determine from other independent evidence that a conspiracy of which both persons were members existed at the time of the act or declaration."

Even if it were assumed that the court had a duty to give CALJIC 935 (Revised) on its own motion, it is not reasonably probable that a result more favorable to Baker as to guilt would have been reached in the absence of the error. (Cal. Const., art. VI, § 13; *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)[3] From the recited facts it is apparent that independent of the

---

[3]We apply the test of prejudice in *People* v. *Watson, supra,* 46 Cal.2d 818, 836, rather than *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710], since, as we have seen, under at least some federal authorities if the trial court admits the statements of an alleged conspirator after finding that independent of the statements there is prima facie proof of the conspiracy and that the statements were made during the conspiracy and in furtherance thereof, the jury need not be instructed that it also must make certain findings before it may consider the evidence against an asserted conspirator other than the declarant. (See authorities cited *ante,* p. 291.)

evidence of Brawley's statements to Glaze there is strong evidence of the existence of a conspiracy between defendants. It is also apparent from those facts that, although the independent evidence of the existence of the conspiracy *at the time of the statements* is less strong, it is sufficient to support a finding that the conspiracy then existed. Had the instruction been given, it is reasonably probable that the jury would have so found and even had the jury failed to so find and in determining Baker's guilt had disregarded Brawley's statements to Glaze, it is not reasonably probable that the jury would have acquitted Baker in view of the other previously recited evidence against him.

### Asserted Error in Admitting Baker's Extrajudicial Statement and in Failing to Give an Instruction Relating Thereto

Brawley contends that the receipt of the evidence that when he handed Baker the wire Baker stated "We won't need this now" violated Brawley's federal constitutional right of confrontation and that in view of that extrajudicial statement an instruction concerning coconspirators' statements such as CALJIC 935 (Revised) should have been given on the court's own motion. However, the receipt of that evidence did not violate Brawley's right of confrontation for reasons previously given in rejecting the similar contention by Baker, and the failure to give the instruction clearly was not prejudicial error.

### Other Claims of Error Relating to Denial of Motion for Severance

■ Baker also moved for a separate trial on the ground that the prosecution would introduce a post-arrest statement by Brawley that implicated Baker. That statement was not introduced at the trial, and any error in denying the motion was not prejudicial. (Cal. Const., art. VI, § 13; *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

■ Baker further argues that a severance should have been granted because of alleged misconduct by the prosecutor and Brawley's attorney that occurred during the guilt trial. However, the propriety of the denial of a motion for separate trials must, of course, be tested as of the time of the submission of the motion (*People* v. *Clark,* 62 Cal.2d 870, 883 [44 Cal. Rptr. 784, 402 P.2d 856]), and the question of error cannot be determined in the context of subsequent developments at the trial (*People* v. *Massie,* 66 Cal.2d 899, 919 [59 Cal.Rptr. 733, 428 P.2d 698]). Thus the asserted misconduct affords no basis for concluding that the court erred in denying the motion for severance.

The claimed misconduct involved statements made at the guilt trial by Brawley's attorney and the prosecutor relating to whether the decedent was

ever convicted of a felony.[4] The court instructed the jury that the matter "is not material to any of the purposes of this trial here, as they have so far been revealed to us" and should not be even discussed by the jury. It must be assumed that the jury followed this instruction. (*People* v. *Gould*, 54 Cal.2d 621, 629 [7 Cal.Rptr. 273, 354 P.2d 865]; *People* v. *David*, 12 Cal.2d 639, 650 [86 P.2d 811].)

*Asserted Error in Denying Motion to Inspect Prosecutor's Records Regarding Prospective Jurors*

During the selection of the jury the defense made a motion for inspection of the prosecutor's records regarding prospective jurors. In support of the motion the defense presented an affidavit by an attorney stating that it has been and is the policy of the prosecutor's office at the end of a trial to make a report regarding the jurors and that a file was kept on each juror showing, among other things, cases on which the juror served, the nature of the charges and the evaluation of the deputy who tried the case as to whether the jury was a good one. Exhibits attached to the affidavit include the jury venire for dates in the 1950's with remarks after some of the juror's names, showing the type of case the juror previously sat in, the verdict, and evaluations by deputy district attorneys.[5] The defense also made an offer of proof that specified witnesses would give similar testimony concerning the practice of the prosecutor's office of keeping records on jurors.

During a lengthy discussion of the matter in chambers, the court asked the prosecution if it had available to it any information respecting the present jury panel bearing upon any matter that would furnish the basis for a challenge for cause, and the prosecution replied, "No."

---

[4]At the guilt trial on cross-examination of the decedent's friend, Mrs. Floridi, Brawley's attorney asked if the decedent was ever convicted of a felony. The prosecutor objected on the ground the matter was immaterial, and the objection was sustained. The prosecutor further stated that "There's no record" and that in view of the prior question he would offer in evidence two "rap sheets." Baker's attorney objected and stated he would like to submit a similar "rap sheet." The court took the matter under submission.

The next day in the jury's presence Brawley's attorney said that he "would offer into evidence the complete rap sheet of the decedent showing his felony conviction." The court denied the offer. The prosecutor, after looking at the sheet, stated, ". . . this is not a felony." The court then gave the instructions hereafter set forth above.

[5]The following are examples of the statements contained in the exhibits: "Would especially recommend [name of juror], strong for prosecution . . .;

"[name of juror] IS DEFINITELY NO GOOD. She would not accept instructions until court read them 2nd time and argued strongly in favor of defts, fantastic stories;

"[name of juror] THIS MAN IS A BAD JUROR. HE'S BEEN ARRESTED ON A CAR THEFT IN FLORIDA AND WILL NOT BELIEVE POLICE OFFICERS. HE IS ANTI-PROSECUTION AND WILL LEAD THE FIGHT FOR ACQUITTAL OR HANG UP JURY;

"[name of juror] should not be used in book making cases."

The motion for inspection was subsequently denied. The court did not thereby err. (*People* v. *Darmiento,* 243 Cal.App.2d 358, 368 [52 Cal.Rptr. 428] [cert. den. 386 U.S. 1010 [18 L.Ed. 438, 87 S.Ct. 1353]]; *People* v. *Superior Court,* 175 Cal.App.2d 830 [1 Cal.Rptr. 55]; cf. *Martin* v. *United States,* 266 F.2d 97, 99; *Best* v. *United States,* 184 F.2d 131, 141 [cert. den. 340 U.S. 939 [95 L.Ed. 677, 71 S.Ct. 480], reh. den. 341 U.S. 907 [95 L.Ed. 1345, 71 S.Ct. 607]]; *Jebbia* v. *United States,* 37 F.2d 343, 344 [cert. den. 281 U.S. 747 [74 L.Ed. 1159, 50 S.Ct. 352]]; see 78 A.L.R.2d 309.)

In urging that they had a right to inspect the prosecutor's records regarding veniremen, defendants point to dictum in *Hamer* v. *United States,* 259 F.2d 274, 281, that ". . . it is up to the individual judge to see that neither attorney has an unfair advantage over the other, whether by use of jury lists or jury books, or any other knowledge or information that exists with respect to a juror's previous action." In *Hamer,* during the selection of the jury after the prosecutor's use of a "jury book" was called to the court's attention, the court ordered him to cease using the book, and on appeal it was held that the court's refusal to declare a mistrial because the book was used did not deprive defendant of his right to an impartial jury. *Hamer* did not deal with the question whether the defendant had a right to inspect the book.

Defendants also cite *Powell* v. *Superior Court,* 48 Cal.2d 704, 705 [312 P.2d 698], but *Powell* involved an application for pretrial inspection of an accused's confessions or admissions and was not concerned with whether the defense has a right to inspect the prosecutor's records regarding prospective jurors.

### Asserted Error in Admitting Certain Evidence

 Baker contends that the wallet taken from him at the time of his arrest was "obtained as a result of an illegal arrest." He asserts that the complaint and warrant for his arrest were invalid under *People* v. *Sesslin,* 68 Cal.2d 418 [67 Cal.Rptr. 409, 439 P.2d 321], and that the record does not show there was probable cause for his arrest. He admits that at the trial no objection was made to the wallet but claims he is not barred from now raising the matter because his trial preceded the decision in *Sesslin.* He requests that the record on appeal be augmented to include the complaint and arrest warrant, copies of which are attached to his request.

 The complaint and arrest warrant were not before the trial court, and it is an elementary rule that ordinarily matters not presented to the trial court and hence not a proper part of the record on appeal will not be considered on appeal. (*People* v. *Merriam,* 66 Cal.2d 390, 396-397 [58 Cal.Rptr. 1, 426 P.2d 151]; *People* v. *Reeves,* 64 Cal.2d 766, 776 [51

Cal.Rptr. 691, 415 P.2d 35]; *People* v. *Arguello,* 61 Cal.2d 210, 213 [37 Cal.Rptr. 601, 390 P.2d 377] [vacated on another ground 63 Cal.2d 566 [47 Cal.Rptr. 485, 407 P.2d 661]]; see Witkin, Cal. Criminal Procedure (1963) p. 666; see also rule 13 of Cal. Rules of Court.) ■■■ The request to augment the record is denied. Since the record does not include the complaint and arrest warrant, or evidence of their contents, the record does not support Baker's claim that they were invalid under *Sesslin.*

Furthermore Baker may not challenge the validity of the warrant for the first time on appeal since the decision in *Sesslin* did not represent "such a substantial change in the former rule as to excuse an objection anticipating that decision." (*People* v. *Groves,* 71 Cal.2d 1196 [80 Cal.Rptr. 745, 458 P.2d 985].)

■■■ Four color photographs of the decedent were admitted over objection on the ground that they were gruesome and would serve primarily to inflame the passions of the jury. Defendants contend that the court thereby erred and assert that the color photographs were not needed because black and white photographs depicting the victim as he was found at the scene of the crime were admitted and the autopsy surgeon testified regarding the number and description of the wounds.

■■■ When assertedly gruesome photographs are presented, the trial court in the exercise of its discretion must decide whether their probative value outweighs their possible prejudicial effect. (*People* v. *Arguello,* 65 Cal.2d 768, 775 [56 Cal.Rptr. 274, 423 P.2d 202]; *People* v. *Mathis,* 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Harrison,* 59 Cal.2d 622, 627-628 [30 Cal.Rptr. 841, 381 P.2d 665].) ■■■ The color photographs here in question were taken at the coroner's office before the autopsy and show the wounds on the nearly nude body of the decedent. The wounds more clearly appear in the color photographs than in the black and white ones, since in the latter the decedent is fully dressed. The color photographs were used by the autopsy surgeon to point out to the jury the numerous lacerations on the body. In addition to illustrating and clarifying the autopsy surgeon's testimony, the pictures constitute circumstantial evidence of malice. They were also relevant at the penalty trial to show facts in aggravation of the penalty. (See *People* v. *Talbot,* 64 Cal.2d 691, 708 [51 Cal.Rptr. 417, 414 P.2d 633] [overruled on another issue in *People* v. *Ireland,* 70 Cal.2d 522, 539-540 [75 Cal.Rptr. 188, 450 P.2d 580].) Although the photographs are unpleasant to view, it cannot be said that the court abused its discretion in admitting them.

*Sufficiency of Evidence to Support Convictions*

The evidence is sufficient to support the conviction of each defendant. The only claim to the contrary is by Baker in an in propria persona supplement to his attorney's briefs.

*Asserted Suppression of Evidence by the Prosecutor*

■ Baker also claims that the district attorney suppressed ·evidence at the guilt trial. The assertedly suppressed evidence apparently consists of testimony by Forrest Patterson that was introduced at the penalty trial. Patterson's testimony concerned extrajudicial statements by Brawley in which he admitted that he stabbed "the taxicab driver" and expressed lack of remorse.

■ The suppression by the prosecution of material evidence favorable to an accused upon request violates due process irrespective of the good or bad faith of the prosecutor. (*Brady* v. *Maryland,* 373 U.S.· 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194]; *In re Lessard,* 62 Cal.2d 497, 508-509 [42 Cal.Rptr. 583, 399 P.2d 39]; *In re Imbler,* 60 Cal.2d 554, 567-569 [35 Cal.Rptr. 293, 387 P.2d 6].)

■ Here, however, it does not appear that the assertedly suppressed evidence would have been favorable·to Baker at the guilt trial. Brawley's admissions constitute inadmissible hearsay as to Baker. (*People* v. *Luker,* 63 Cal.2d 464, 476 [47 Cal.Rptr. 209, 407 P.2d 9]; *People* v. *Roberts,* 40 Cal.2d 483, 489 [254 P.2d 501].) Also, even had the evidence of the admissions been received at the guilt trial and had the jury ignored an instruction limiting the evidence to Brawley, the evidence would not have tended to exculpate Baker since the jury was instructed on the law of conspiracy and aiding and abetting in the commission of a crime.

Furthermore, the record does not show that the district attorney suppressed the evidence. At the penalty trial defense counsel objected to the use of Patterson's testimony unless the district attorney made an offer of proof that the witness was unknown before "the last motion for discovery [i.e. one made on December 5, 1966]." The district attorney thereupon stated that he did not know of Patterson until after the jury retired at the guilt trial [i.e. December 13, 1966]—that at that time when he returned to his office he found his investigator there with Patterson.

Baker points to testimony by Patterson that during the latter part of November 1966 he told a deputy sheriff "about what [Patterson] discussed here," and Baker asserts that it "is obvious that this information was transmitted to the office of the District Attorney before December 5." However, in the absence of proof that it was so transmitted, we cannot

assume that it was. It further appears from Patterson's testimony that the information he gave to the deputy sheriff he also gave to the district attorney's investigator, and it may be inferred from Patterson's testimony that the date he gave the information to the investigator was December 5, 1966. Until the information was given to the district attorney, however, he manifestly could not furnish it to Baker.

*Asserted Error in Excluding Veniremen Opposed to Capital Punishment*

 Defendants contend that several veniremen were improperly excused for cause on the ground of their opposition to capital punishment. *Witherspoon v. Illinois, supra,* 391 U.S. 510, held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."[6]

Here the record shows that the jury was chosen by excluding veniremen for cause on a basis that was not permissible under *Witherspoon.* For example, one venireman was asked, "Do you have any settled conviction with respect to the use of the death penalty in a proper case?," and, upon his reply, "Yes, sir, I don't believe in capital punishment," the court excused him on its own motion. Under the mandate of *Witherspoon* the death penalties must be reversed.

 Defendants further assert that the exclusion of veniremen on the ground of their opposition toward capital punishment denied defendants their right to an unbiased jury representing a cross-section of the community at the *guilt* phase of their trial. However, as we recently stated in *In re Eli,* 71 Cal.2d 214, 218 [77 Cal.Rptr. 665, 454 P.2d 337], and *In re Arguello,* 71 Cal.2d 13, 16 [76 Cal.Rptr. 633, 452 P.2d 921], "[I]n the absence of persuasive documentation we must agree with the United States Supreme Court that 'We . . . cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.' (*Witherspoon v. Illinois, supra,* 391 U.S. 510, 517-518 . . .; see also *Anderson* and *Saterfield,* . . . 69 Cal.2d 613, 617, 620-621 [73 Cal.Rptr. 21, 447 P.2d 117]; *People v. Gonzales,* 66 Cal.2d 482, 498-499. . . .)"

---

[6]Defendants were tried before the *Witherspoon* decision, but that decision must be applied retroactively. (*Witherspoon v. Illinois, supra,* 391 U.S. 510, 523, fn. 22 [20 L.Ed.2d 776, 785].)

Defendants request an evidentiary hearing on the matter but (1) do not state whether or not they are now prepared for such a hearing and (2) give no indication of the nature of the evidence they intend to introduce. Under these circumstances an evidentiary hearing is not warranted. (*In re Eli, supra,* 71 Cal.2d at p. 218; *In re Arguello, supra,* 71 Cal.2d at p. 17.)

### Additional Asserted Errors Relating to the Penalty Trial

For the guidance of the court at the penalty retrial we consider several additional contentions by defendants regarding their penalty trial.

Baker contends that it was error to admit testimony by Patterson concerning certain extrajudicial statements by Brawley without deleting the part implicating Baker. At the penalty trial the prosecution made an offer of proof that Patterson would testify, among other things, to discussions by Brawley of plans by Brawley and other inmates, including Baker, to escape. Baker's attorney asked that the witness be instructed to omit Baker's name, and the court declined to do so. Thereafter Patterson testified that Brawley stated in part that, if the trial went against him, he and others would kill a deputy, get the keys and open the cell to free Baker, and the prosecutor elicited further testimony from Patterson that Brawley and Baker had opportunities to talk together and did so. The court limited Patterson's testimony regarding Brawley's extrajudicial statements to Brawley, but there was, of course, a possibility that the jury might have been unable to follow this instruction, have drawn an inference from the evidence that Baker was a party to the escape plan, and have considered this matter in determining Baker's penalty.

Under the rationale of *Bruton* v. *United States, supra,* 391 U.S. 123, and *People* v. *Aranda, supra,* 63 Cal.2d 518, it is clear that if Patterson's testimony is offered at the penalty retrial and Baker askes that Patterson be instructed to omit Baker's name the court, outside the presence of the jury, should comply with the request. *Bruton* and *Aranda* were concerned with the danger that the jury would be unable to follow limiting instructions regarding a defendant's extrajudicial statements that implicate a codefendant, and, although those decisions involved a confession, the same danger exists for the statment here in question. Baker's name could be effectively deleted from Brawley's extrajudicial statements without prejudice to Brawley.

Defendants further contend that at the penalty trial the court erred in refusing to give a requested instruction that aggravating or

mitigating circumstances must be proved beyond a reasonable doubt before the jury may consider them.[7] However, decisions have held that such instructions erroneously limit the jury's absolute discretion in the selection of the penalty. (*People v. Hines, supra,* 61 Cal.2d 164, 173 [37 Cal.Rptr. 622, 390 P.2d 398]; *People v. Howk,* 56 Cal.2d 687, 697 et seq. [16 Cal.Rptr. 370, 365 P.2d 426]; *People v. Purvis,* 56 Cal.2d 93, 95-96 [13 Cal.Rptr. 801, 362 P.2d 713].)

Here the jury was correctly instructed that other crimes must be proved beyond a reasonable doubt before the jury may consider them. (*People v. Polk, supra,* 63 Cal.2d 443, 450-451 [47 Cal.Rptr. 1, 406 P.2d 641]; *People v. Terry,* 61 Cal.2d 137, 149, fn. 8 [37 Cal.Rptr. 605, 390 P.2d 381].) Defendants urge that the rule in *Polk* and *Terry* be extended to all aggravating or mitigating circumstances. However, that rule was established as an exception to the normal standard of proof at the penalty trial since evidence of other crimes may have a particularly damaging impact on the jury's determination whether the defendant should be executed. (See *People v. Polk, supra,* at pp. 450-451.)

Defendants further assert that failure to instruct regarding the quantum of proof necessary to establish mitigating or aggravating circumstances violates due process. However, attacks upon the constitutionality of Penal Code section 190.1 on the ground that it failed to provide standards for the guidance of the jury at the penalty trial have been rejected (*In re Anderson, supra,* 69 Cal.2d 613, 621-628; *People v. Hill, supra,* 66 Cal.2d 536, 568-569 [58 Cal.Rptr. 340, 426 P.2d 908] [cert. den. 389 U.S. 993 [19 L.Ed.2d 884, 88 S.Ct. 838] and 390 U.S. 911 [19 L.Ed.2d 884, 88 S.Ct. 838]]; *People v. Seiterle,* 65 Cal.2d 333, 340 [54 Cal.Rptr. 745, 420 P.2d 217] [cert. den. 387 U.S. 912 [18 L.Ed.2d 633, 87 S.Ct. 1699]]), and the present assertion likewise lacks merit.

Defendants contend that at the penalty trial the court erred in refusing to give a requested instruction informing the jury that their determination of penalty must be a rational decision, that they must not allow their passions to be inflamed by the color photographs of the victim or the exhibits showing his blood, and that this evidence was received for the limited purpose of showing the manner in which the decedent was killed.[8]

[7]The requested instruction reads: "Although it is not essential to your decision that you find mitigating circumstances or circumstances of aggravation, before you may consider such circumstances you must be satisfied that such circumstances are proved beyond reasonable doubt as above defined."

[8]The instruction read: "The determination of the penalty in this case must be a rational decision. Evidence consisting of color photographs showing the body of the victim as well as other exhibits showing the blood of the victim must not inflame your passions and you must not allow this evidence to cloud your reasoning. This evidence may be received for the limited purpose of showing the manner in which the decedent

Failure to give the instruction was not prejudicial error since the court instructed the jury that both sides "demand and expect, that you conscientiously and dispassionately consider and weigh the evidence [which, of course, included the photographs and exhibits] and apply the law of the case and that you will reach a just verdict."

Defendants also complain that at the penalty trial they were allowed to make but one argument whereas the prosecution was allowed to make two. The trial preceded *People* v. *Bandhauer,* 66 Cal.2d 524, 530-531 [58 Cal.Rptr. 332, 426 P.2d 900], and upon the penalty retrial the court undoubtedly will comply with *Bandhauer*.

Defendants further claim that comments by the prosecutor during his argument at the penalty trial constituted prejudicial misconduct. It is unnecessary to consider this claim since *Witherspoon* requires a reversal of the death penalties and the same arguments may not be repeated on retrial.

Defendants also adopt by reference the arguments advanced in *In re Anderson, supra,* 69 Cal.2d 613, attacking the constitutionality of the death penalty and the procedures followed in imposing it. Those arguments, however, are settled by our decision in *Anderson*.

The judgments are reversed insofar as they relate to the penalty for the murder; in all other respects they are affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**McCOMB, J.,** Dissenting.—I would affirm the judgments in their entirety.

---

was killed, however, I caution you again that you must not allow this evidence to inflame your passions against the defendant."